UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARION HOLEMAN AND | : | |
| WALLACE HOLEMAN, | : | |
| ADMINISTRATRIXES OF THE | : | |
| ESTATE OF DARRELL HOLEMAN | : | NO.:  3:00CV1608 (DJS) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW LONDON, | : | |
| NEW LONDON POLICE DEPARTMENT, | : | |
| GASPAR VINCENT GARCIA, | : | |
| BRUCE RINEHART, GREG WILLIAMS | : | |
| AND JOHN DOE | : | October 27, 2003 |

## DEFENDANTS' OPPOSITION MEMORANDUM TO OFFICE OF ADULT PROBATION'S MOTION FOR PROTECTIVE ORDER

### I.    RELEVANT PROCEDURAL HISTORY:

The defendants subpoenaed the Office of Adult Probation ("OAP") on

August 14, 2003, and requested the disclosure of the following materials:

"Your entire file pertaining to Darrell Rodney Holeman, DOB 6/7/57, Inmate #00087224, including, but not limited to, all reports, documents, memorandums, notes, materials, pertaining to his confinement, education, rehabilitation, discipline, work program information, medical history, medical-psychological evaluations, and release."

(Subpoena, **Exhibit A.**)

The OAP, although not a party to this action, moved the Court for a protective order on or about October 8, 2003, seeking the non-disclosure of: (1) all records, generally, pursuant to Connecticut State Statute; (2) the Pre-Sentence Investigation Reports relating to the decedent (Darrell Holeman) and all paperwork incidental to making the report; (3) medical, mental health and addiction records; and (4) Non-conviction information contained within criminal history records of Darrell Holeman.

The defendants oppose, in part, the OAP's motion for protective order on the grounds that the information sought is relevant and necessary for the preparation of their defense against the liability aspect of this case, the plaintiffs' damages claim under § 1983, and Connecticut's wrongful death statute, General Statutes § 52-555.  In the interest of resolving this issue, the defendants will not seek any records, documents and/or other information regarding the arrest of Darrell Holeman that did not result in a conviction.

2

## II.   **FACTUAL BACKGROUND:**

The plaintiffs, Marion and Wallace Holeman, bring this action as administratrixes of the estate of Darrell Holeman, following an August 22, 1999 incident that resulted in the shooting death of Darrell Holeman. The defendants are the City of New London, the New London Police Department, Officer Gaspar Vincent Garcia, Chief Bruce Rinehart, Officer Greg Williams and John Doe.

On August 22, 1999, at approximately 4:30 a.m., Officer Greg Williams made an investigatory stop of a suspicious vehicle operated by Karrie Smith, in which the plaintiffs' decedent, Darrell Holeman, was riding as a passenger. Shortly after the vehicle was pulled over, Officer Gaspar Garcia arrived on the scene as backup to Officer Williams. During the ensuing investigation of this traffic stop, Darrell Holeman was fatally shot by Officer Garcia. The defendants hereby incorporate by reference the Statement of Facts contained in the attached Local Rule 9(C)(1) Statement, which Statement of Facts provides a more detailed background to this incident (Statement of Facts, **Exhibit B**).

As a result of this incident and following Darrell Holeman's death, the plaintiffs brought the following action against the defendants. The

3

plaintiffs' single count complaint contains federal and state causes of action, including a claim under the Connecticut wrongful death statute.

Evidence discovered in this case thus far disclosed that the decedent Darrell Holeman was incarcerated over half of his life, with the latest term being a twelve (12) year incarceration period. This latest twelve-year incarceration period ended only 7-8 months before the subject shooting incident.

## III. **STANDARD OF LAW:**

The scope of discovery is provided in Rule 26 (b) of the Federal Rules of Civil Procedure. Rule 26 (b) (1) reads, in part:

> "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears calculated to lead to the discovery of admissible evidence."

In federal actions, discovery should be broad, and all relevant materials, which are reasonably calculated to lead to the discovery of admissible evidence, should be permitted. Fed.R.Civ.P. 26(b)(1); <u>United</u>

States v. Nixon, 418 U.S. 683, 709 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive") Ismal v. Cohen, No. 85-0121, slip op. at 6 (S.D.N.Y. 1986) (indicating that in § 1983 actions, federal policy favors broad construction of the already liberal discovery rules).

The Federal District Court case Roesberg v. Johns-Manville Corp., 85 F.R.D. 292 (E.D. Pa. 1980) discussed the broad scope of discovery as follows:

> "[R]elevancy, and to a lesser extent burdensomeness, constitute the principal inquiry …. In the interests of a fair trial, eliminating surprise and achieving justice, relevancy, construed liberally, creates a broad vista for discovery, … ***and makes trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent***."

(Emphasis added) Roesberg, 85 F.R.D. at 295-96; see, also, Southern New England T.V. v. Hartford Fire Ins., 12 Conn. L. Rptr., No. 2, 62 (Aug. 8, 1994).

Rule 26 (c) discusses the use of protective orders. Rule 26 (C) reads, in relevant part:

> "Upon motion by a party or person from whom discovery is sought, accompanied by a certificate that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause

shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ***If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery.***" (Emphasis added).

## IV.  LAW AND ARGUMENT:

The defendants hereby address the arguments of the Office of Adult Probations in the order presented within its October 8, 2003 Memorandum of Law.

### A.    Specific Records are subject to disclosure

The OAP argues that C.G.S. § 54-63d(e) unequivocally prohibits the disclosure of <u>any</u> records in their possession. (C.G.S. § 54-63d attached hereto as **Exhibit C**).  The OAP, however, fails to comment upon the exception set forth in Subsection (f) of this Statute.

Section 54-63d applies to Court Support Services Division, which now encompasses the Office of Adult Probation, the Office of Alternative Sanctions, the Office of the Bail Commission, the Family Division and the Juvenile Detention Services Division. C.G.S. § 51-1d.  Section 54-63d(e)

pertains to the disclosure of a wide range of records and/or information

from all of the aforesaid divisions.  This Subsection reads:

> (e) ***Except as provided in subsections (f) and (g) of this
> section***, all information provided to the Court Support Services
> Division shall be for the sole purpose of determining and
> recommending the conditions of release, and shall otherwise be
> confidential and retained in the files of the Court Support Services
> Division, and not be subject to subpoena or other court process for
> use in any other proceeding or for any other purpose. (Emphasis
> added).

The OAP does not comment on the exception to Subsection (e)'s

blanket effect.  Subsection (f) of this Statute reads as follows, in relevant

part:

> (f) The Court Support Services Division shall establish written
> procedures for the release of information contained in reports and
> files of the Court Support Services Division…. Such procedures shall
> allow access to … (2) ***all information provided to the Court
> Support Services Division by probation officers for the
> purposes of compiling presentence reports***; and (3) ***all
> information provided to the Court Support Services Division
> concerning any person convicted of a crime and held in
> custody by the Department of Correction.*** (Emphasis added).

The defendants understand that there are highly sensitive records in

the possession of the Court Support Services Division, and that these

records should not be disclosed for any reason.  However, information

subject to the exception within Subsection (f), i.e., information provided to

the Court Support Services Division from the Office of Adult Probation for the purposes of compiling presentence reports, and all information provided to Court Support Services Division concerning Darrell Holeman, who was convicted of crimes and held by the Department of Corrections, are relevant, material and germane to the defense of this action.

The defendants are unaware of the Court Support Services Divisions written procedures for the release of this information, but the defendants submit that the Court may order the disclosure, pursuant to the dictates of Fed.R.Civ.P. Rule 26(c).

### B.  Presentence Investigation Report Documents

The OAP seeks a protective order for disclosure of Darrell Holeman's presentence investigation reports because such reports are not public records, and therefore, "would be remiss were it to produce [such] absent court order." (OAP Memo., p. 4).

Connecticut Practice Book § 43-9 provides in relevant part that:

"The presentence investigation and alternate incarceration assessment reports shall not be public records and shall not be accessible to the public. . . . [However,] ***they shall be available . . . [to any] court of proper jurisdiction where it is relevant to any proceeding before such court.*** Such court may also order that the

report be made available to counsel for the parties for the purpose of such proceeding." §§ 43-9, 43-9 (7).

"Presentence investigation reports serve to assist courts in setting appropriate sentences and to help corrections officials make informed decisions with respect to convicted offenders. Steadwell v. Warden, 186 Conn. 153, 159, 439 A.2d 1078 (1982). Reports typically discuss 'the circumstances of the offens[e] [in question], the attitude of the victim or his immediate family, the criminal record, social history and present condition of the defendant, and, if desirable, the mental and physical state of the defendant.' Id., 158-59; see General Statutes 54-91a; Practice Book [§ 43-4]. Only the sentencing judge, parties to the sentencing hearing, certain corrections officers, **courts in subsequent proceedings where the report is relevant**, and, if the court so orders, counsel at the subsequent proceeding may have copies of the presentence report." (Emphasis added.) State v. Fair, 197 Conn. 106, 113 (1985).

In the instant case, the plaintiffs have brought a § 1983 claim, in addition to a wrongful death claim pursuant to General Statutes § 52-555.[1]

---

[1] General Statutes § 52-555 provides in part that: "In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for

In addition to recovering special damages for medical and funeral costs, the plaintiffs seek general damages. See, Kiniry v. Danbury Hospital, 183 Conn. 448, 460 (1981); see also § 52-555. "[T]he three elements of general damages [are]:  (1) compensation for conscious pain and suffering; (2) lost earning capacity less deductions for necessary living expenses, discounted for present cash value; and (3) compensation for the destruction of life's enjoyment." Id.; Katsetos v. Nolan, 170 Conn. 637, 657 (1976); Floyd v. Fruit Industries, Inc., 144 Conn. 659, 669-71 (1957).

In connection with the damages for the destruction of the capacity to carry on life's activities . . . evidence as to the decedent's hobbies and recreation would be admissible and, to the extent that the proof warranted, would presumably operate to enhance [or decrease] the amount of the verdict. Floyd v. Fruit Industries, Inc., supra, 144 Conn. 676. "Suffice it to say that, except for the special expenses allowable under the statute, all these elements are, of necessity, imponderable and largely speculative. No one can place a definite value upon them, nor can one do more than

---

such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, provided no action shall be brought to recover such damages and disbursements but within two years from the date of death, and except that no such action may be brought more than five years from the date of the act or omission complained of."

10

conjecture as to what the future course of any life, if continued, would have been.  At best, the trier must take the evidence and make an intelligent estimate." Fairbanks v. State, 143 Conn. 653, 659 (1956).

In order for a jury to make an "intelligent estimate" of damages, it must have reliable information regarding Darrell Holeman's life. See, Fairbanks v. State, supra, 143 Conn. 659.  Just prior to Darrell Holeman's death, he was incarcerated by the State for twelve continuous years. Further, the fact that Darrell Holeman was imprisoned for at least more than a quarter of his life speaks directly to the second and third element of the plaintiffs' claim, i.e. lost earning capacity and compensation for the destruction of life's enjoyment.  The information contained in the presentence investigation reports, such as Darrell Holeman's "attitude of . . . his immediate family, the criminal record, social history and  . . . condition of [Darrell Holeman's] . . . mental and physical state" are relevant and discoverable in this case.  State v. Fair, supra 197 Conn. 113.  This is so, because the information sought is relevant, and necessary for determining Darrell Holeman's loss of life's enjoyment, an element that must be established in pursuing a State law wrongful death claim.

## C. <u>Medical, Mental Health and Addiction Records</u>

### 1. **Mental Health Records**

The OAP argues that it is prohibited from disclosing records regarding Darrell Holeman's mental health because confidential communications between persons and professional counselors, § 52-146s, social workers, § 52-146o, doctors and other health care providers, § 52-52-146d, and psychologists, § 52-146c, are protected by statutory privileges. The OAP, however, does not discuss the issue of waiver.

Connecticut recognizes doctor-patient privilege, for communications made during the treatment of both mental and physical ailments; see infra; and "[l]ike other testimonial privileges, the patient may of course waive the[se] protection[s]." <u>Jaffee v. Redmond</u>, 518 U.S. 1, 15 n.14 (1996). With regard to the patient-psychologists privilege, General Statutes § 52-146c provides in pertinent part:

> "[I]n civil and criminal actions . . . all communications shall be privileged and a psychologist shall not disclose any such communications unless the person or his authorized representative consents to waive the privilege and allow such disclosure. . . . Consent of the person shall not be required for the disclosure of such person's communications . . . ***If, in a civil proceeding***, a person introduces his psychological condition as an element of his claim or defense or, after a person's death, ***his condition is introduced by a party claiming*** or defending through or as a beneficiary of the

12

person, and the judge finds that it is more important to the interests
of justice that the communications be disclosed than that the
relationship between the person and psychologist be protected . . . ."

Likewise, General Statutes § 52-146s provides that:

"[A] professional counselor shall not disclose any such
communications unless the person or the authorized representative of
such person consents to waive the privilege and allow such
disclosure. . . . Consent of the person shall not be required for the
disclosure of such person's communications . . . *If, in a civil
proceeding*, a person introduces such person's mental health
condition as an element of the claim or defense of such person or,
after a person's death, *the condition of such person is
introduced by a party claiming* or defending through or as a
beneficiary of the person, and the judge finds that it is more
important to the interests of justice that the communications be
disclosed than that the relationship between the person and
professional counselor be protected . . ."

A similar exception is provided for in regard to communications made

between a person and his social worker, § 52-146q (c) (4).

In the instant case, by filing this lawsuit in which the plaintiffs

assert that the decedent suffered physical and psychological harm, the

plaintiffs have placed the decedent's state of medical and psychological

health at issue. See, Everhart v. National Railroad Passenger Corp., Cause

No. IP01-1221-C-H/K (S.D.Ind. 2003); Davis v. Berge, 01-C-265-C

(W.D.Wis. 2002); Shots v. CSX Transp., Inc., 887 F.Supp. 206, 207

(S.D.Ind. 1995) (Cases attached hereto as **Exhibit D**).  The plaintiff's

decedent's medical and psychological history is therefore relevant, material

and discoverable in this case. See, Id.

Additionally, the defendants require his physical and mental health

records, not only to show his physical and mental health at the time of the

incident, but also because any information evidencing Darrell Holeman's

quality of life will be necessary for determining the destruction to Darrell

Holeman's life enjoyment.  Naturally, mental health is an important

element of anyone's quality of life, including Darrell Holeman's.

### 2. Medical Records

General Statutes § 52-146o,[2] which addresses communications

between a patient and his doctor or other health care provider, states a

different exception than those stated above, and provides in pertinent part

that:

---

[2] The privilege stated in General Statutes § 52-146o provides in part that: "in any civil
action or any proceeding preliminary thereto . . . a physician or surgeon, as defined in
subsection (b) of section 20-7b, shall not disclose (1) any communication made to him by,
or any information obtained by him from, a patient or the conservator or guardian of a
patient with respect to any actual or supposed physical or mental disease or disorder or
(2) any information obtained by personal examination of a patient, unless the patient or
his authorized representative explicitly consents to such disclosure."

14

"Consent of the patient or his authorized representative shall not be required for the disclosure of such communication or information (1) pursuant to any statute or regulation of any state agency **or the rules of court** . . . ." (Emphasis added.) § 52-1460 (b) (1).

Darrell Holeman's physical health, as well as his mental health, is relevant for determining his lost earning capacity and compensation for the destruction of life's enjoyment. Darrell Holeman's physical fitness or lack there of, naturally impacted his ability to work, and his quality of life. Without medical records in the possession of the DOC, the court and jury may be left with conjecture concerning this issue.

## C. Criminal History Records

The OAP argues that it is prohibited from disclosing any nonconviction information it has on Darrell Holeman, including those records that have been "erased" pursuant to § 54-142a.[3] The defendants only seek the

_____

[3] General Statutes § 54-142a provides in relevant part: "Whenever in any criminal case, on or after October 1, 1969, the accused, by final judgment, is found not guilty of the charge or the charge is dismissed, all police and court records and records of any state's attorney pertaining to such charge shall be erased upon the expiration of the time to file a writ of error or take an appeal, if an appeal is not taken, or upon final determination of the appeal sustaining a finding of not guilty or a dismissal, if an appeal is taken." General Statutes § 54-142c (a) provides in pertinent part: "The clerk of the court or any person charged with retention and control of erased records by the Chief Court Administrator or any criminal justice agency having information contained in such erased records shall not

criminal history records of Darrell Holeman that they are entitled to under

the Freedom of Information Act, General Statutes §§ 1-201 et. seq., and

General Statutes § 54-142k.

Section 52-142k provides in pertinent part:

"Each person or agency holding criminal history record information
shall establish reasonable hours and places of inspection of such
information. . . . Conviction information shall be available to the
public for _any_ purpose." (Emphasis added.)

Accordingly, the defendants are entitled to disclosure of all of OAP's

criminal records regarding any and all crimes for which Darrell Holeman

was convicted of in the past.

---

disclose to anyone the existence of such erased record or information pertaining to any
charge erased . . . ."

16

## V.    CONCLUSION:

Based on the foregoing, the defendants in this matter respectfully request that this Court deny the OAP's motion for protective order, and permit the defendants to discover the requested documents and information, except non-conviction records.

DEFENDANTS,
CITY OF NEW LONDON, NEW
LONDON POLICE DEPARTMENT,
GASPAR VINCENT GARCIA, BRUCE
RINEHART, GREG WILLIAMS AND
JOHN DOE

By_____
   Daniel C. DeMerchant
   Howd & Ludorf
   65 Wethersfield Avenue
   Hartford, CT  06114
   (860) 249-1361
   ct19342

17

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 27th day of October, 2003.

Sandy M. Moore, Esquire
Attorney at Law
80 Broad Street
New London, CT  06320

Jeffrey T. Londregan, Esquire
Conway & Londregan, P.C.
38 Huntington Street
P.O. Box 1351
New London, CT  06320-1351

Richard Hustad Miller, Esquire
P.O. Box 365
Uncasville, CT 06382

Lynn D. Wittenbrink, Esquire
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120

Daniel C. DeMerchant

18

Exhibit A

# United States District Court

MARION HOLEMAN AND WALLACE HOLEMAN,          DISTRICT OF    CONNECTICUT
ADMINISTRATRIXES OF ESTATE OF
DARREL HOLEMAN

V.

CITY OF NEW LONDON, NEW LONDON POLICE                    **SUBPOENA IN A CIVIL CASE**
DEPARTMENT, CASPAR VINCENT GARCIA, BRUCE
RINEHART, GREG WILLIAMS, AND JOHN DOE                    CASE NUMBER: 3:00CV1608   (DJS)

TO:   Office of Adult Probation
      153 Williams Street
      New London, CT

☐ **YOU ARE COMMANDED** to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Conway & Londregan, 38 Huntington St., New London, CT | Tuesday, August 26, 2003 11:00 a.m. |

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached Schedule A

| PLACE | DATE AND TIME |
|---|---|
| Conway & Londregan, 38 Huntington St., New London, CT | Tuesday, August 26, 2003 11:00 a.m. |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

**A TRUE COPY ATTEST**

Michele Avery, Process Server

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for the Defendants | 8-11-03 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel C. DeMerchant, Esq., Howd & Ludorf, 65 Wethersfield Ave., Hartford, CT 860-249-1361

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

## **SCHEDULE A**

Your entire file pertaining to Darrell Rodney Holeman, DOB 6/7/57, Inmate #00087224, including, but not limited to, all reports, documents, memorandums, notes, materials, pertaining to his probation, work history, education, probation violations, if any, probation reviews, warnings, conviction history, confinement history, interviews and counseling, medical history, medical-psychological evaluations, and termination of probation, if applicable.

Exhibit B

COPY

FILED

2002 DEC 20 P 1:30

U.S. DISTRICT COURT HARTFORD CT

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARION HOLEMAN AND WALLACE HOLEMAN, ADMINISTRATRIXES OF THE ESTATE OF DARRELL HOLEMAN | : | NO.: 3:00CV1308 (DJS) |
| v. | : | |
| CITY OF NEW LONDON, NEW LONDON POLICE DEPARTMENT, GASPAR VINCENT GARCIA, BRUCE RINEHART, GREG WILLIAMS AND JOHN DOE | : | DECEMBER 20, 2002 |

**LOCAL RULE 9(C)(1) STATEMENT OF FACTS**

Pursuant to Fed. R. Civ. P. 56(c) and D. Conn. L. Civ. R. 9(c)(1), the defendants submit the following Affidavit of Material Facts Not In Dispute in support of their Motion for Summary Judgment and Memorandum of Law in support of their Motion for Summary Judgment dated December, 2002.

1. The plaintiffs' decedent, Darrell Holeman, was a citizen of the United States and a resident of the City of New London at the time of his death. (Complaint, ¶5).

2. The defendants Gaspar Vincent Garcia and Greg Williams were duly appointed police officers with the City of New London at the time of the incident alleged in the Complaint. (Complaint, ¶¶7, 8).

3. Defendant, Bruce Rinehart is the Chief of Police for the City of New London. (Complaint, ¶10).

4.      The defendant, City of New London, is a municipal corporation organized under the laws of Connecticut and was the employer of the defendants Garcia, Williams and Rinehart at the time of the incident alleged in the Complaint. (Complaint, ¶11).

5.      On August 22, 1999, at approximately 2:58 in the morning, Officer Williams was assigned to investigate a "prowler" call in the area of 38 Plant Street in New London. (Affidavit and signed nine-page statement of Officer Williams, dated 8-22-99, attached as **Exhibit A**).

6.      As part of his search for the "prowler" Officer Williams conducted "square block loops" in his police vehicle. (Williams, **Exhibit A**).

7.      On August 22, 1999, sometime after 4:10 in the morning, Officer Williams observed a car traveling on Pequot Avenue in New London. (Williams, **Exhibit A**).

8.      Officer Williams began following this car in his police vehicle and observed the car's maneuvers. (Williams, **Exhibit A**).

9.      Officer Williams observed this car hesitate and stop at an intersection, then proceed to complete a route which placed the vehicle where it would have been had it simply stayed its course when Officer Williams first saw the vehicle. (Williams, **Exhibit A**).

10.      Officer Williams believed that the driver of the car might have been lost. Officer Williams was suspicious of the evasive, illogical route taken by the car and he was suspicious that criminal activity may be afoot. (Williams, **Exhibit A**).

11.      This activity took place in a high crime area in New London. (Williams, **Exhibit A**).

12.      Officer Williams radioed the car's license plate number into police headquarters and learned the car was registered in Groton, Connecticut. (Williams, **Exhibit A**).

13.      At approximately 4:30 in the morning, Officer Williams stopped this car, which was being operated by Kerri Smith and in which the plaintiffs' decedent was riding as a passenger. (Complaint, ¶13) (Williams, **Exhibit A**).

2

14.    Officer Williams approached the driver of the vehicle and asked the driver if she was lost. (Williams, **Exhibit A**).

15.    The female driver, now known as Karrie Smith, responded that she was lost and trying to find a pay phone. (Williams, **Exhibit A**).

16. Officer Williams asked her whom she intended to call.  Ms. Smith replied: "My babysitter, I need to check on my children." (Williams, **Exhibit A**).

17.    Officer Williams then asked what she was doing in New London, to which Ms. Smith replied that she was house sitting in Watertown. (Williams, **Exhibit A**).

18.    Since her answer was non-responsive to the question, Officer Williams again asked Ms. Smith what she was doing in New London, to which Ms. Smith responded: "I'm trying to find a store." (Williams, **Exhibit A**).

19.    Officer Williams asked both the driver and the plaintiffs' decedent for identification. (Williams, **Exhibit A**).

20.    At about this time Officer Garcia arrived on the scene as backup to Officer Williams. (Williams, **Exhibit A**) (Affidavit and signed nine-page statement of Officer Garcia, dated 8-22-99, attached as **Exhibit B**).

21.    The male passenger did not make eye contact with Officer Williams, but he did hand over a State of Connecticut Photo Identification. (Williams, **Exhibit A**).

22.    After providing the identification information to headquarters, the officers learned from headquarters that the passenger, Darrell Holeman, was currently on probation for drug activity. (Williams, **Exhibit A**) (Garcia, **Exhibit B**).

23.    Officer Williams returned to the stopped vehicle and asked Karrie Smith if she had any weapons, bombs, drugs, dead bodies or contraband in the car.  Officer Williams routinely includes the term "dead bodies" in such a request to illicit a laugh.  Karrie Smith did not laugh or smile. (Williams, **Exhibit A**).

3

24.    Officer Williams asked if Ms. Smith would step out of the car to allow him to search the car. (Williams, **Exhibit A**).

25.    Karrie Smith agreed to let Officer Williams search her car and she exited the car to allow this to happen. (Williams, **Exhibit A**) (Affidavit and signed statement of Karrie Smith, dated 8-22-99, attached as **Exhibit C**).

26.    After Ms. Smith exited the vehicle, she was "patted down" by Officer Williams. No weapons or contraband were found on her person. (Williams, **Exhibit A**).

27.    Officer Williams then directed Officer Garcia to get the male passenger out of car as well. (Williams, **Exhibit A**) (Garcia, **Exhibit B**).

28.    Officer Garcia then opened the passenger side door to allow the male passenger to exit the vehicle. (Garcia, **Exhibit B**).

29.    Officer Garcia, based on the nervous actions of the male passenger was concerned that the passenger may attempt to run away from him or attempt a physical confrontation with him. (Garcia, **Exhibit B**).

30.    Officer Garcia believed that the passenger, Darrell Holeman was acting very furtive. Mr. Holeman was not complying with Officer Garcia's verbal commands. (Garcia, **Exhibit B**) (Smith, **Exhibit C**).

31.    Once Mr. Holeman was outside of the vehicle, Officer Garcia asked him to place his hands on the roof of the vehicle. (Garcia, **Exhibit B**).

32.    In response to this command, Mr. Holeman only lifted his hands slightly, but did not place them on the roof of the vehicle as requested. (Garcia, **Exhibit B**) (Smith, **Exhibit C**).

33.    Officer Garcia felt threatened by Mr. Holeman's lack of compliance. (Garcia, **Exhibit B**).

34.    Officer Garcia then asked Mr. Holeman once again, this time in a more assertive voice, to place his hands on the roof of the vehicle. (Garcia, **Exhibit B**).

4

35.    In response to this second command, Mr. Holeman raised his arms out in front of him, shoulder height, and said, "I'll show you what I got in my pocket." (Garcia, **Exhibit B**).

36.    Mr. Holeman then made a sudden move with his right hand towards his front pants pocket. (Garcia, **Exhibit B**).

37.    Fearing for the safety of all present, Officer Garcia grabbed Mr. Holeman's right arm in an arm bar hold and attempted to push Mr. Holeman back against the vehicle to gain control of him. (Garcia, **Exhibit B**).

38.    Officer Garcia called out to Officer Williams for assistance, and Officer Williams came over to assist Officer Garcia in his struggle with Mr. Holeman. (Garcia, **Exhibit B**).

39.    Officer Williams put his left hand on Mr. Holeman's left forearm, and his right arm in a headlock position around Mr. Holeman's head. A physical struggle ensued as Mr. Holeman was resisting the effort of the officers to secure him. (Williams, **Exhibit A**) (Garcia, **Exhibit B**).

40.    Mr. Holeman continued to struggle with, and resist, the officers during this time. (Williams, **Exhibit A**) (Garcia, **Exhibit B**).

41.    Officer Williams then yelled for a bystander to open the door to his police vehicle to release this police canine, "Nero." (Williams, **Exhibit A**).

42.    Nero joined the struggle by engaging Mr. Holeman. (Williams, **Exhibit A**).

43.    At the time the police dog engaged Mr. Holeman, Officer Garcia lost his hold on Mr. Holeman's right arm. Officer Garcia then observed Mr. Holeman reach towards his right front pants pocket with his right hand and pull out a small, silver handgun. (Garcia, **Exhibit B**).

44.    One week before this incident occurred, Karrie Smith had observed a similar small, silver handgun with black grips in an apartment in Groton, CT where Darrell Holeman was staying. (Two-page signed statement of Karrie Smith, dated 8-27-99, included as part of **Exhibit C**).

5

45.     Officer Garcia then yelled to Officer Williams that Mr. Holeman had a gun. (Garcia, **Exhibit B**).

46.     Officer Williams felt a metal object at this time and also heard Officer Garcia say that Holeman had a gun. (Williams, **Exhibit A**).

47.     Officer Williams, who still had Mr. Holeman in a headlock hold, feared for his life at this point, and attempted to gain some separation from Mr. Holeman by pushing him away. (Williams, **Exhibit A**).

48.     Officer Garcia observed Mr. Holeman raise the gun with his right hand, point the gun behind him, and in the direction of Officer Williams' head. Fearing that Mr. Holeman would shoot and kill Officer Williams, Officer Garcia fired one shot at Mr. Holeman. (Garcia, **Exhibit B**).

49.     Based on the location of Mr. Holeman's arm wounds, the examination of the firearms evidence, and Officer Williams injury, it was determined that Officer Williams right forearm was close to or in contact with Mr. Holeman's left arm at the time Officer Garcia discharged his weapon. (State of Connecticut, Forensics Science Laboratory (FSL) Report, Summary, p.12, par. 8, copy attached as **Exhibit D**).

50.     Officer Williams again tried to push away from Mr. Holeman. Officer Williams then fell to the ground near the front of the vehicle and noticed he (Officer Williams) had been shot. (Williams, **Exhibit A**).

51.     Officer Williams then quickly took cover behind the front of the vehicle. (Williams, **Exhibit A**).

52.     At the time Officer Williams fell to the ground, Officer Garcia observed Mr. Holeman lower the gun and point the gun at his head and chest area. Fearing that Mr. Holeman would shoot him, Officer Garcia fired two or three more shots at Mr. Holeman, while moving to his right in an attempt to get out of Mr. Holeman's line of sight. (Garcia, **Exhibit B**).

6

53.    Trajectory reconstruction indicates that Mr. Holeman was most likely in a standing position near the rear passenger side of the vehicle, with the passenger side door open, when he received his injuries. (FSL Report, Summary, p.12, par. 6 and 7, **Exhibit D**).

54.    Trajectory reconstruction further indicates that the most likely position of Officer Garcia was to the left of the decedent. (FSL Report, Summary, p.11, par. 5, **Exhibit D**).  This is consistent with the Officers statements attached hereto as **Exhibit A** and **B**. (FSL Report, Summary, p. 13, par. 9, **Exhibit D**).

55.    Mr. Holeman then lowered his hands near his midsection and fell to the ground between the open car door and the car itself. (Garcia, **Exhibit B**).

56.    When Mr. Holeman fell to the ground, Officer Garcia lost sight of the gun Mr. Holeman had been holding.  (Garcia, **Exhibit B**).

57.    Officer Williams then came around to the side of the car where Officer Garcia was standing and observed Mr. Holeman lying on the ground near the car.  Officer Williams also could not see Mr. Holeman's hands, as they were still near his midsection. (Williams, **Exhibit A**).

58.    Seeing that Mr. Holeman was conscious, Officer Williams ordered Mr. Holeman several times to show his hands.  Mr. Holeman did not comply.  (Williams, **Exhibit A**) (Garcia, **Exhibit B**).

59.    Officer Williams then ordered "Nero" to engage Mr. Holeman again by yelling, "Get him."  Mr. Holeman continued to resist, did not react at all to the canine's advances, and did not show the officers his hands.  (Williams, **Exhibit A**).

60.    Officer Williams then struck Mr. Holeman a couple of times in his head area in an attempt to bring forth compliance, and have Mr. Holeman show his hands.  Mr. Holeman continued to resist the officers' commands and the officers believed that Mr. Holeman was still holding onto his gun.  (Williams, **Exhibit A**).

7

61.     Officer Garcia then observed Mr. Holeman's left hand come out from underneath Mr. Holeman.  (Garcia, **Exhibit B**).

62.     Officer Garcia then holstered his weapon and placed Mr. Holeman's left hand in handcuffs.  (Garcia, **Exhibit B**).

63.     The officers then were able to get Mr. Holeman's right arm behind his back and placed his right hand into the handcuffs.  (Garcia, **Exhibit B**).

64.     Officer Garcia radioed headquarters at 4:36:45 a.m. that shots had been fired. (Edwards, **Exhibit E**).

65.     Officer Garcia radioed dispatch for an ambulance at 4:37:19 a.m. (Edwards, **Exhibit E**).

66.     The scene was declared "safe" to bring in an ambulance at 4:38:15 a.m. (Edwards, **Exhibit E**).

67.     Firefighter-EMTs were immediately dispatched to the scene of the incident for a report of a police officer involved shooting.  (Affidavit and three-page signed statement of Joseph L. Nott, attached as **Exhibit F**; Affidavit and three-page signed statement of Richard F. Burgess, attached as **Exhibit G**; Affidavit and three-page signed statement of Jeffrey M. Rheaume, attached as **Exhibit H**).

68.     Upon arrival at the scene, the EMTs immediately began rendering emergency medical treatment to Mr. Holeman, despite his continued uncooperative behavior. (**Exhibits F, G & H**).

69.     The EMTs were on scene and to the hospital within eight (8) minutes. (Nott, **Exhibit F**).

70.     There is as radio transmission at 4:49:03 a.m. reporting that the first ambulance arrived at L&M Hospital with Mr. Holeman.  (Edwards, **Exhibit E**).

8

71.     The medical personnel on scene located Mr. Holeman's handgun next to the right rear tire of the vehicle, between the tire and the curb.  (Garcia, **Exhibit B**), (Nott, **Exhibit F**), (Burgess, **Exhibit G**).

72.     This is the area were Mr. Holeman had fallen after he was shot. (Garcia, **Exhibit B**).

73.     This handgun is similar to the handgun observed by Karrie Smith one week earlier in an apartment where Mr. Holeman was staying.  (Smith, **Exhibit C**).

74.     The aforesaid factual events are supported by the State of Connecticut, Division of Criminal Justice Report of the States' Attorney's Finding of Fact resulting from the State of Connecticut Major Crime Squad Investigation, said Report made pursuant to authority of law. (State's Report, Finding of Fact, **Exhibit I**) (Admissible under F.R.E. 803(8)(C)).

75.     Officers Garcia and Williams completed the required training at the police academy (Edwards, **Exhibit E**).

76.     While at the police academy, Officers Garcia and Williams received training, *inter alia*, regarding: criminal investigation, human relations, defensive tactics, and use of force (Edwards, **Exhibit E**).

77.     Prior to 2000, Officers Garcia and Williams were required to attend approximately forty hours of training in job related subjects within a three-year period to re-certify (Edwards, **Exhibit E**).

78.     In July of 2002, this requirement was increased to 60 hours (Edwards, **Exhibit E**).

79.     Prior to August 22, 1999, Officers Garcia and Williams attended supplemental training courses as part of their re-certification requirement dealing with laws of arrest, stopping suspects, use of force, search and seizures, firearms training, shooting decisions, and tactical weapons use (Edwards, **Exhibit E**).

80.     Officer Williams was a certified canine handler at the time of the subject incident, having been so certified by the North American Work Dog Association.  (Edwards, **Exhibit E**).

9

DEFENDANTS,
CITY OF NEW LONDON, NEW LONDON
POLICE DEPARTMENT, GASPAR VINCENT
GARCIA, BRUCE RINEHART, GREG
WILLIAMS AND JOHN DOE


By _____
Thomas R. Gerarde
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
ct05640

10

**CERTIFICATION**

       This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 20th day of December, 2002.

Sandy M. Moore, Esquire
Attorney at Law
80 Broad Street
New London, CT  06320

Jeffrey T. Londregan, Esquire
Conway & Londregan, P.C.
38 Huntington Street
P.O. Box 1351
New London, CT  06320-1351

Richard Hustad Miller, Esquire
P.O. Box 365
Uncasville, CT 06382


Thomas R. Gerarde