FILED

2004 MAR -1 P 2: 00

UNITED STATES DISTRICT COURT

U.S. DISTRICT COURT
HARTFORD, CT.

DISTRICT OF CONNECTICUT

MARION HOLEMAN AND            :
WALLACE HOLEMAN,              :
ADMINISTRATRIXES OF THE       :
ESTATE OF DARRELL HOLEMAN     :    NO.:  3:00CV1608 (DJS)
                              :
v.                            :
                              :
                              :
CITY OF NEW LONDON,           :
NEW LONDON POLICE DEPARTMENT, :
GASPAR VINCENT GARCIA,        :
BRUCE RINEHART, GREG WILLIAMS :
AND JOHN DOE                  :    FEBRUARY 26, 2004

## DEFENDANTS' STATEMENT IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR SANCTIONS DATED FEBRUARY 17, 2004

The defendants hereby object to the plaintiffs' Motion for Sanctions, dated

February 17, 2004, as being without reason or basis and an unfortunate attempt to give

post-purpose meaning for unilaterally suspending the deposition of February 10, 2004.

I.    **RELEVANT BACKGROUND**

The plaintiffs served a Notice of Deposition upon the defendants, scheduling the

deposition of the defendant's liability expert, Lt. Daniel Wicks, for November 24, 2003.

This Notice of Deposition had an attached Schedule A., requesting that Lt. Wicks bring

with him, inter alia, documents relied upon by him in rendering his opinions.


ORAL ARGUMENT IS REQUESTED

On November 24, 2003, Lt. Wicks arrived for his deposition with two boxes of documents, consisting of, _inter alia_, deposition transcripts, discovery production, investigation documents and materials, and the like.  The plaintiffs, through counsel, deposed Lt. Wicks throughout the day, questioning him as to his qualifications and the documents he brought with him that day.  Towards the end of the day, plaintiffs' counsel began asking Lt. Wicks about his opinions set forth within his Expert Report.

Lt. Wicks' Expert Report does footnote six or seven treatises or textbooks and references a few court cases. (Lt. Wicks Report, **Exhibit B**).  Lt. Wicks footnoted to these textbooks to support a few of his opinions concerning police procedure and policy.  At the deposition, plaintiffs' counsel demanded that Lt. Wick's supply a copy of the court cases he cited within the Report. (Deposition of Lt. Wicks, 11/24/03, p. 161, **Exhibit A**).  Undersigned counsel offered to immediately obtain these cases for plaintiffs' counsel, but she declined this offer. (Deposition of Lt. Wicks, 11/24/03, p. 161-162, **Exhibit A**).  Lt. Wicks responded that he would research and supply a copy of the court cases, and that he thought he had brought everything of importance. (Deposition of Lt. Wicks, 11/24/03, p. 161-163, **Exhibit A**).  A discussion by counsel was held on the record concerning the production of textbooks and cases:

> MR DEMERCHANT:  You want him to print out a copy of the Supreme Court case that's online?  I'll be glad to do it for you right now, if you'd like.

MS MOORE:  Well, basically that I want him to do is comply with, you know, my schedule A.  So if he used some documents, you know, other than what's in this box, I want a copy of it.

MR. DEMERCHANT:  Treatises and books and everything else?

MS. MOORE:  Anything that he used.

(Deposition of Lt. Wicks, 11/24/03, p. 161-162, **Exhibit A**).

Plaintiffs' counsel concluded the first day of the deposition at approximately 4:55 p.m. to be reconvened another day.  (Deposition of Lt. Wicks, 11/24/03, p. 214, **Exhibit A**).  Plaintiffs' counsel did not question Lt. Wicks past page four of his fourteen-page Report. (Deposition of Lt. Wicks, 11/24/03, p. 212-214, **Exhibit A**).

The defendants did not object to a *reasonable* continuation to complete the deposition of Lt. Wicks.  By way of Re-Notice of Deposition, dated January 26, 2004, the plaintiffs, through counsel, re-noticed the deposition of Lt. Wicks.  (Re-Notice of Deposition, **Exhibit C**).  This deposition re-notice attached the same Schedule A. as the first notice of deposition, listing documents for Lt. Wicks to bring with him to his deposition. (Re-Notice of Deposition, **Exhibit C**).

On Tuesday, February 10, 2004, the plaintiffs began the continuation of the deposition of Lt. Wicks.  As instructed by undersigned counsel, Lt. Wicks brought personal treatises and textbooks from his personal library to the continued deposition, which consisted of textbooks he footnoted in his Expert Report.  Lt. Wicks voluntarily

3

brought additional textbooks and manuals to buttress his opinions set forth within his Expert Report, which were called into question by plaintiffs' counsel during the first-day of examination.

During the second-day deposition, plaintiffs' counsel Attorney Moore represented that she was entitled to a copy of all the treatises and books brought to the deposition by Lt. Daniel Wicks, which consists of eight to twelve hard and soft covered books. Plaintiffs' counsel represented that the defendants would have to pay for the copying costs. Counsel had discussion on the record concerning this issue, and both agreed to seek judicial determination following the deposition.

Attorney Moore began to question Lt. Wicks concerning two cases he had cited at the deposition (not in his Report), these cases were cited within one of the manuals he had brought with him that day. During the questioning, Attorney Moore represented that she wished to mark each treatise and book with exhibit stickers. Lt. Wicks was apprehensive with respect to placing stickers on his personal treatises and books, and set forth his need for these original materials. In an effort to compromise, undersigned counsel offered Attorney Moore alternative measures for marking the original treatises, including (1) copying the cover and pages referenced and marking the same, and/or (2) copying each cover, placing an exhibit sticker on the copy and affixing the same to the

original book by either paper clip or staple. Attorney Moore rejected the offers of compromise.

Plaintiffs' counsel refused to continue with the deposition without marking original texts. Knowing that Lt. Wicks came from Massachusetts for his deposition, undersigned counsel called chambers in an attempt to obtain a telephone conference with Judge Squatrito. Undersigned counsel communicated with a clerk, who informed me that counsel's request for a telephone conference with Judge Squatrito would be impossible. Attorney Moore refused to continue the deposition despite undersigned counsel informing her that Lt. Wicks had prepared for this continued deposition and that he had traveled from Massachusetts to attend the same. All of the above communications were made part of the record, and the relevant transcripts will be supplemented with this Statement in Opposition upon the defendants' receipt of the same.

By way of Motion for Protective Order dated February 12, 2004, the defendants moved the court for an order protecting them from having to copy thousands of irrelevant pages from textbooks, and marking original textbooks with exhibit tabs (Motion for Protective Order, dated February 12, 2004). The plaintiffs responded to this Motion on or about February 17, 2004, *now concurring with the defendants' position that it is unnecessary to copy thousands of pages, or place exhibit tabs on Lt. Wick's original materials*. (Plaintiff's Response, dated February 14, 2004). Instead,

5

the plaintiffs, through their counsel, now move for sanctions, reasoning that the unilateral termination of the second day of examination was due to the fault of the defendants, caused by a surprise, or late production of texts.

## II.    LAW AND ARGUMENT

The plaintiffs move this Court under Fed. Civ. Pro. Rule 30 (d) (3) and Rule 37 (b) (2)[1] requesting the imposition of sanctions against the defendants, arguing that the defendants delayed a second day of deposition testimony by the sudden production of legal texts. (Plaintiff's Motion for Sanctions, dated February 17, 2004, p. 1).  The defendants submit that the plaintiffs' motion is without basis.

Rule 30(d)(3) reads as follows:

"If the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent, it may impose upon the person responsible an appropriate sanction, including reasonable costs and attorney's fees incurred by any parties as a result thereof."

The standard for sanctions under Rule 30(d)(3) is whether the conduct by counsel frustrated the fair examination of the deponent.  Rule 30(d)(3) explicitly leaves it to the court's discretion to determine whether any activity has frustrated the fair examination of a deponent.

---

[1]  The plaintiffs cite to Rule 37 (b) (2); however, the defendants question its application to the instant issue, as there is no claim against a party for violating a court order.

In the instant case, if anyone impeded, delayed or frustrated the examination of the deponent, it was plaintiffs' counsel, herself, for needlessly suspending Lt. Wicks' deposition after less than one hour of testimony. The plaintiffs, through counsel, unequivocally cancelled the second scheduled day of examination because undersigned counsel requested that she not place original exhibit tabs on Lt. Wicks' personal textbooks. Undersigned counsel and Attorney Moore went off the record to call chambers in order to receive a ruling on this issue. When counsel was informed that Judge Squatrito was not available, Attorney Moore suspended the examination of Lt. Wicks until the Court could render a ruling upon this issue. Undersigned counsel objected to the suspension of the deposition, and advised Attorney Moore that Lt. Wicks had prepared for his deposition at length, and that he had traveled from Massachusetts to attend the same. In addition to the boxes of documents produced at the first-day deposition, Lt. Wicks brought textbooks and copies of cases to this second scheduled deposition, in full compliance with the subpoena. These communications were made part of the record, and a transcript will be supplemented to this brief.

Further, the plaintiffs were not entitled to a second day of examination according to the clear and express language of Rule 37 (d)(2). At the end of the first day of examination, the plaintiffs' counsel informed the undersigned counsel that she will require a second day of examination. The plaintiffs, though counsel, re-noticed the

7

deposition of Lt. Wicks, and attached a Schedule A.   (Re-Notice of Deposition, **Exhibit C**).  Plaintiffs' counsel did not request that the treatises or texts be made available in advance of the deposition.  Plaintiffs' counsel did not call or correspond to continue the second-day deposition because she did not receive texts or treatises in advance of the deposition.  Plaintiffs' counsel did not file a Motion to Compel following the November 24, 2003 deposition.  Instead, plaintiffs' counsel ***went forward*** with the second-day deposition.  The defendants have no idea why the plaintiffs, through counsel, are now claiming a frustration with the examination of Lt. Wicks when he appeared ready to testify, and produced the requested documents and materials.

Lastly, the defendants have tried to be as accommodating as possible, and to avoid conflict or court intervention at every turn.  For example, when the defendants deposed the plaintiffs' disclosed liability expert, he failed to bring ***numerous*** materials that he cited and relied upon in rendering his opinions, which were subject to the defendants' subpoena. (Noel McGregor Deposition, July 29, 2003, p. 48-50, 98-103, 238, **Exhibit D**).  The defendants did not seek court intervention or sanctions, nor did they suspend his deposition, as this was unnecessary.  Instead, undersigned counsel asked that he produce the requested documents.  Unlike Lt. Wicks, however, the plaintiffs' liability expert has yet to comply fully with the defendants' subpoena.

8

## III.   **CONCLUSION**:

Based on the foregoing, the defendants respectfully request that this Court deny

the plaintiffs' Motion for Sanctions, and enter an order protecting the defendants and its

expert for those reasons set forth within their Motion for Protective Order, dated

February 12, 2004.  The defendants further request an order of reasonable attorney's

fees for preparing this Statement in Opposition, and their Motion for Protective Order,

which seeks an order the plaintiffs *now concede* is reasonable.

DEFENDANTS,
CITY OF NEW LONDON, NEW LONDON
POLICE DEPARTMENT, GASPAR
VINCENT GARCIA, BRUCE RINEHART,
GREG WILLIAMS AND JOHN DOE


By_____
    Daniel C. DeMerchant
    Howd & Ludorf
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    ct19342

9

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 26th day of February, 2004.

Sandy M. Moore, Esquire
Attorney at Law
80 Broad Street
New London, CT  06320

Jeffrey T. Londregan, Esquire
Conway & Londregan, P.C.
38 Huntington Street
P.O. Box 1351
New London, CT  06320-1351

Richard Hustad Miller, Esquire
P.O. Box 365
Uncasville, CT 06382

Daniel C. DeMerchant

Exhibit A

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF DARRELL HOLEMAN,    :    CIVIL ACTION NO.:
ET AL., Plaintiffs            :    3:00-CV1608 (DJS)
                              :
VS.                           :
                              :
                              :
CITY OF NEW LONDON, ET AL.    :
Defendants                    :    NOVEMBER 24, 2003

DEPOSITION OF DANIEL C. WICKS

A P P E A R A N C E S:

    LAW OFFICE OF SANDY M. MOORE
    Attorney at Law
        80 Broad Street
        New London, Connecticut   06320
    BY:  SANDY M. MOORE, ESQ.

    Representing the Plaintiffs.

    HOWD & LUDORF
    Attorneys at Law
        65 Wethersfield Avenue
        Hartford, Connecticut   06114
    BY:  DANIEL C. DeMERCHANT, ESQ.

    Representing the Defendants.

Kimberly A. Riley
Shea & Driscoll
Court Reporting Associates
16 Seabreeze Drive
Waterford, Connecticut 06385

1    Q    There's a case in here where you say that, "A

2  standard set by the Supreme Court in the Commonwealth of

3  Pennsylvania versus Edwards."  Can you explain to me what

4  that case is about?

5    A    That's a Supreme Court case where they determined

6  that the standard for stopping a motor vehicle in this

7  country is reasonable suspicion.

8    Q    And did you read the case in its entirety?

9    A    I believe I did.

10    Q    And do you have a copy of that case?

11    A    No.  But I can furnish one if you need it.

12    Q    And where did you get this case?

13    A    I got it from some documents I keep in my home.

14    Q    And did you rely on this case in helping you to

15  render your decision in this report?

16    A    Yes.  This is one facet of it, yes.

17    Q    And that case is not included in this box; is

18  that correct?

19    A    That's correct.

20    Q    And why not?

21    A    I referenced it in my footnotes.

22    Q    But you will be able to put a copy of what was

23  used from this case in your box?

24    A    Sure.

25        MR. DeMERCHANT:  You want him to print out a

1      copy of a Supreme Court case that's online?  I'll

2      be glad to do it for you right now, if you'd

3      like.

4           MS. MOORE:  Well, basically what I want him

5      to do is comply with, you know, my Schedule A.

6      So if he used some document, you know, other than

7      what's in this box, I want a copy of it.

8           MR. DeMERCHANT:  Treatises and books and

9      everything else?

10          MS. MOORE:  Anything that he used.

11          MR. DeMERCHANT:  Well, you give me a list of

12     everything you believe you're entitled to under

13     Schedule A and --

14          MS. MOORE:  I'm going to go through it.  I'm

15     going to go through it with him.  So that would

16     be No. 1, if you're taking notes.

17     Q    So you're going to supply me with a copy of the

18     case that you looked at in forming your opinion; is that

19     correct?

20     A    I'm going to speak with Attorney DeMerchant about

21     that.

22     Q    You do realize what a Schedule A is?  Are you

23     familiar with those?

24     A    I believe so.

25     Q    And what does it say?

163

1    A    It's attached to the subpoena requiring me to

2 bring the documents that I received in connection with this

3 case.

4    Q    And you do realize a subpoena is a legal

5 document?

6    A    I do.

7    Q    So do you think that it would be important for

8 you to bring everything you relied on in the case to put in

9 that box?  Did you think that?

10                MR. DeMERCHANT:  Objection.  Don't badger

11                the witness, please.

12    A    I felt that I brought everything relevant.

13    Q    Okay.  So you made some decisions about what you

14 were going to encompass in that box with regard to what you

15 relied on; is that correct?

16    A    I tried to use -- I tried to respond as

17 reasonably as possible to the subpoena.

18    Q    But there are some things that you felt were

19 irrelevant that you didn't include in that box?

20    A    Yes.

21    Q    And you'd be able to give me a list of those

22 things that you felt were irrelevant not to include?  Can

23 you do that?

24                MR. DeMERCHANT:  Objection.

25    A    I'm not sure.  I believe I brought everything of

1   officer, New London police officer?

2       A    That's my opinion, yes.

3       Q    In fact, let me just ask you this while we're

4   here, because we're getting to the point where Garcia comes

5   onto the scene, when you do stop a vehicle, in your

6   experience, do you radio dispatch to tell them what the

7   circumstances of the stop are?

8       A    No.  I've never heard of that occurring.

9       Q    So when you stop a vehicle, you don't radio in,

10  you just stop it?  And at some point you don't radio in

11  what you're stopping the vehicle for?

12      A    It depends on each department's procedures.

13  Personally I've been on two different departments that did

14  it two different ways.

15      Q    And can you explain those two different ways?

16      A    When I was a New Hampshire officer, we'd call in

17  and we would advise of the location and the license plate

18  number of the stop.  And in Massachusetts, we don't call

19  in.  We just stop the vehicle.

20      Q    Now, that's in New Hampshire and Massachusetts.

21  In the state of Connecticut, do you know the procedure?

22      A    I assume it's going to be close to those two

23  states.

24      Q    Well, I don't want you to assume.  Do you need to

25  look at something here to determine what Connecticut's

1   procedure is with regard to stopping a vehicle, whether or

2   not the procedure would be radioing the license plate and

3   telling them the location that they're stopping?

4        A    I have nothing here to indicate either way.

5        Q    Well, wouldn't it be helpful to you when you're

6   examining the police procedure of Officer Williams whether

7   or not he was following procedure that was accepted in

8   New London or required in New London when he stopped that

9   vehicle?

10                  MR. DeMERCHANT:  Objection to form.

11       A    The radio transmission he made when he stopped

12  the car was reasonable for police practices across the

13  country.

14       Q    But had there been a procedure in place to tell

15  you the license plate, the location, like you did in New

16  Hampshire, and Officer Williams didn't -- if that had been

17  in place in New London, Connecticut, would that have been

18  helpful to you to determine whether or not Officer Williams

19  followed police procedure?

20                  MR. DeMERCHANT:  Objection to form.

21       A    I believe he did follow police procedure.

22       Q    But you said you don't even know what the

23  procedure in New London, Connecticut, is, do you?

24       A    No.  But I've traveled throughout the country and

25  I know generally what's accepted police practices.

1      Q    So you're going basically on your travel

2  throughout the country and not any information where you

3  obtained from the New London Police Department with regard

4  to their procedures?

5      A    That's correct.

6          MS. MOORE:  Well, I think this is the

7          perfect point to get dates, because I'm going to

8          need another day.

9          At this point in time it is 4:55 on

10        November 24th.  We're going to conclude the first

11        day of deposition of Lieutenant Daniel Wicks and

12        we are going to reconvene at a date that's going

13        to be announced.

14          (Whereupon the witness was excused and the

15        deposition was suspended at 4:55 p.m.)

16

17               * * * * *

18

19

20

21

22

23

24

25

1   STATE OF CONNECTICUT   )
                           )
2   COUNTY OF NEW LONDON   )

3           I, Kimberly A. Riley, a Notary Public within and

4   for the State of Connecticut, do hereby certify that I took

5   the deposition of, DANIEL C. WICKS, a witness in the

6   above-entitled action pursuant to the Federal Rules of

7   Civil Procedure on the 24th day of November, 2003, at the

8   offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford,

9   Connecticut, commencing at 10:20 a.m.

10          I further certify that said witness was by me

11  duly sworn to testify to the truth, the whole truth and

12  nothing but the truth, and that the following testimony was

13  taken by me stenographically and thereafter reduced to

14  writing under my supervision.

15          I further certify that I am not an attorney,

16  relative or employee of any party hereto nor otherwise

17  interested in the event of this cause.

18          In witness whereof, I have hereunto set my hand

19  and affixed my seal this 15th day of December, 2003.

20

21                              _____
                                Kimberly A. Riley, LSR
22                              Notary Public
                                License Number:  00204
23

24

25  My Commission Expires November 30, 2004.

# The Opinion of Daniel Wicks concerning the shooting of
# - Darrell R. Holeman -

## Opinion:

I, Daniel Wicks, have reviewed numerous documents pertaining to the shooting death of Darrell R. Holeman. Based on a review of these documents, combined with my training and experience, as well as research I have conducted on deadly force encounters I have formed the opinion that the use of lethal force utilized by Officer Garcia, of the New London Police Department (NLPD), was reasonable, appropriate and necessary.

Further, it is my opinion that Officers Garcia and Williams attempted to utilize all reasonable lower force control options in an attempt to overcome Mr. Holeman's resistance. The lower force options were unsuccessful due solely to Mr. Holeman's determined resistance and willingness to escalate to lethal force. As a result of the failure of lower levels of force and Mr. Holeman's vigorous attempts to shoot both of the officers; Officer Garcia's selection of deadly force was the only rational and safe option left available to him. Had Officer Garcia continued to attempt lower levels of force it is highly probable that NLPD Officer Gregory P. Williams, would have been shot by Mr. Holeman. In addition, Officer Garcia himself was in an extremely perilous situation when Mr. Holeman turned the handgun on him. Due to the homicidal manifestations displayed by Mr. Holeman, the life of civilian Consuelo Rodriguez was clearly in jeopardy as well. Ms. Rodriguez was standing very near this deadly confrontation and clearly was in peril by Mr. Holeman's lethal conduct. Officer Garcia obviously had a duty and obligation to protect Officer Williams, Ms. Rodriguez and himself from the clear and present deadly threat posed by Mr. Holeman.

Additionally, I have reviewed the training and supervision records of both Officers Garcia and Williams. I find that the training these two officers received at the Connecticut Municipal police academy and the subsequent in-service training that they received in the NLPD was effective, suitable and comparable, or in some cases exceeded training offered throughout the United States law enforcement community.

At the time of this shooting, the firearms training program provided by the NLPD was outstanding. The NLPD firearms training program exceeded the State of Connecticut requirements for firearms training. NLPD providing a full **45%** more firearms training than was required by the state of Connecticut. At the time of the Holeman shooting, state requirements for municipal police officers were nine (9) hours of firearms training during a three year period. Officers Williams and Garcia each received a total of fourteen (14) hours of firearms training in the years 1997, 1998 and 1999.[1] These classes included areas of firearms training that are frequently not examined during mandatory in-service firearms training.

---

[1] Please see Officers Williams' and Garcia's NLPD firearms records

These blocks of instruction were **simunitions training,**[2] instruction dedicated solely to making **deadly force decisions** (shoot/don't shoot), also offered during NLPD's in-service training was a class on the **tactical use of firearms**. These three aspects of firearms training are critical components for properly preparing police officers for deadly force encounters. Commonly, mandated in-service firearms programs are limited to training basic marksmanship, reloading drills and clearing malfunctions in the weapon. I find NLPD's firearms training program to be exemplary and many communities across the nation could emulate this commendable program.

To form the opinions I have examined the below documents:

- The State's Attorney of the district on New London's summary of evidence.
- The statement of Officer Gregory P. Williams.
- The statement of Officer Gaspar V. Garcia.
- The statement of Officer Michael Meehan.
- The autopsy analysis.
- A Connecticut State Police (CSP) prepared timeline of the events regarding this shooting.
- Witness statements from Karrie L. Smith, Consuelo Rodrigues, Richard F. Burges Joseph L. Nott Jr., Russell Barberi, Jeffrey Rheaume, Steven Wargo, James P. Renshaw, James R. Guretsky, Joseph Gouvin III, Leanne Darling, Yolanda D. Edwards, Theodora A. MacQuilan, Donna L. Mote, Gladys Alvares, Benjamin L. Nazario, Jose A. Ortiz, Michael C. Gaston, Jeannine S. Lombardi, Tracy L. Perry, and Heather M. Wright.
- Physical evidence and scene analysis by CT State Police.
- The finding of fact, prepared by the State's Attorney of the district on New London.
- The closing remarks prepared by Kevin T. Kane the State Attorney of the New London District.
- Crime scene photos.
- Crime scene diagrams.
- The crime scene reconstruction by Eastern District Major Crime Squad.
- Opinion of Noel McGregor.
- The annual firearms programs for the New London Police (1999 and 2000)
- Production of documents request #4 (from New London Police)
- Production of documents request #6 (from New London Police)
- Production of documents request #14 (from New London Police)
- Production of documents request #15 (from New London Police)
- Production of documents request #20 (from New London Police)
- Production of documents request #25 (from New London Police)
- The training and evaluation of records of Officers Williams and Garcia.
- Interrogatory #15 & 16
- The depositions of Officers Williams and Garcia, Ms. Smith, and Mr. Noel McGregor.

---

[2] Ibid. #1

2

## Rational for my opinion:

The above documents have provided me with the following facts and circumstances that were present during this encounter:

**The rational for the motor vehicle stop** conducted by Off. Williams was appropriate and based on sound reasonable suspicion. A standard set by the Supreme Court in Commonwealth of Pennsylvania v. Edwards. Additional rational for this motor vehicle stop was the community caretaker function. While following this automobile, an Acura, it made numerous turns, onto various streets, at low speeds, which ultimately resulted in bringing this vehicle back to a location that it could have reached by simply driving straight.[3] A reasonable police officer would believe that the operator was lost or displaying unusual and inappropriate driving behavior. This assumption would be based on the above facts Off. Williams was confronted with immediately prior to stopping the Acura as well as those listed below:

I.    The late hour, 4:28 AM, with little or no other traffic in the area.

II.   The area selected to drive in; a neighborhood where criminal activity is common, including shots fired[4] and Off. Williams had just cleared from a call where he was searching for a reported prowler in the immediate area.

III.  In Commonwealth v. Alvarado, 420Mass.542 (1995) the court stated that police lawfully stopped a vehicle "based on the peculiar maneuverings and the extremely slow speed at which it was traveling". In this case the operator of the Acura was driving at low speed and making numerous unnecessary turns.

IV.   It appeared quite likely that the operator of the Acura was lost and needed assistance with directions. Off. Williams had conducted a state of Connecticut license plate inquiry and learned that the Acura was registered in a different community (Groton, CT).[5] In Off. Williams' report he noted a number of unnecessary turns at low speeds by the Acura, which more likely than not would indicate the operator was lost. Due to the community caretaker standard for police officers, the low level of reasonable suspicion as a standard for stopping a motor vehicle is not required, as long as the officer reasonably believes that a citizen is in some form of distress. I believe that this was a factor in Off. William's mind before he stopped the Acura.

V.    Off. Williams states in his statement to the CSP investigators "*I believe this car was a green Acura Integra with dark tinted windows CT registration 461-KFN.*[6] According to Connecticut state motor vehicle law, 14.99GE, tinted windows must have a tint compliance sticker affixed to it by the DMV. Tint can be no

---

[3] See deposition of Ms. Smith, where she states she intentionally made numerous turns to see if she was being followed
[4] See Holeman witness statements of Gouvin, Mote and Gaston
[5] See Officer Williams' statement on shooting incident
[6] Ibid. #5

darker than 35 percent, plus or minus three percent.    I suggest that Off. Williams was well within the reasonable suspicion standard to stop the Acura for an inspection of the window tint and compliance sticker.  This sole factor in and of its self would have been sufficient justification for this motor vehicle stop.  Further, due to this dark window tint it was not possible for Off. Williams to see into the Acura to determine if the operator and passengers were in distress.  In Off. Williams' deposition, he states that he has a tint meter to measure the degree of tint on auto windows.

**Once stopped** Off. Williams used solid patrol tactics, by utilizing a back-up officer[7] (Off. Garcia).  Off. Williams was fully permitted to ask for the driver's, (Ms. Smith's) license and registration, and then ask her to exit her auto according to Pennsylvania v. Mimms, 434 U.S. 106 (1977).   The decision by Off. Williams to request to search the Acura was both reasonable and appropriate, based on his training and experience.  Off. Williams had been a college campus police officer as well as a NLPD Officer for more than five and a half years.  This training and experience was combined with the unusual circumstances surrounding this motor vehicle stop.  They are:

I.      Once stopped Off. Williams asked Ms. Smith what she was doing in New London, she initially stated that she was lost and needed to find a telephone.

II.     When asked what she was doing in New London a second time, Ms. Smith at first avoided the question by stating that she was taking care of a house in Waterford.  When asked a third time, she provided a bizarre response, stating that she was looking for a store, in New London (at 4:28 a.m.).

III.    License and criminal history checks on the vehicle's occupants revealed that Mr. Holeman was on probation for narcotics violations.

IV.     After speaking to Ms. Smith it became obvious that she was not lost, but was cruising in a high crime area, at very unusual hours of the morning, at very low speeds.

V.      Ms. Smith used evasive answers to specific questions, when asked if there was any contraband in her car, Ms. Smith answered *"as far as I know, there's nothing in the car, or nothing in the car that I can speak of."*[8]

Off. Williams was acting well within constitutional requirements and state law to request a consent search of the Acura.  A reasonable and experienced officer would have been remiss if he/she did not make such a request, based on the above factors for the initial stop and the subsequent observations and conversation Off. Williams had with the occupants of the Acura.

---

[7] According to the FBI profile on officers killed on duty, the single most significant factor was officers failed to call for back-up personnel.
[8] See the statements of Off. Williams and Ms. Smith to the CSP investigators

In Ms. Smith's statements to the CSP investigators she makes no mention of feeling forced into giving consent to search. Further there were only two officers on scene and the canine was secured inside a police vehicle, certainly a minimal display of force. Once Ms. Smith had given consent to search the Acura it is a common and efficient law enforcement practice to search the occupants before searching the vehicle.[9] Off. Garcia's order to Mr. Holeman to exit the auto was also lawful and appropriate. In order to conduct the consent search, authorized by Ms. Smith, the vehicle owner, Mr. Holeman had to step out of the vehicle both for officer safety and search efficiency. Training across this country requires officers to remove and search all occupants before searching the vehicle.[10] The United States Supreme Court has approved of removing passengers from stopped vehicles in Maryland v. Wilson (1997) the court stated "*an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.*" Further, according to Terry v. Ohio, 392 U.S. 1(1968) "pat frisks" are legally performed when the officer has based his/her decision on specific and articulate facts that the suspect has, is, or is about to commit a crime. In this specific stop, Off. Williams was confronted with the following factors that justified a pat frisk:

I.    A lack of "fit" between the individual motorists, also with the neighborhood. Ms. Smith had no criminal record and Mr. Holeman was a convicted felon, and they were from demographically very different communities.

II.   The unusual time of night to be going to a "store", in a different community from where the operator was living.

III.  Ms. Smith was associating with a known criminal, Mr. Holeman.

IV.   Their suspicious presence in a high crime area at a very odd time.

V.    Evasive answers to specific and basic questions, "*Why are you in New London?*" Also when asked if there was any contraband in her car, Ms. Smith answered "*as far as I know, there's nothing in the car, or nothing in the car that I can speak of.*"

VI.   Unusual behavior on the part of Mr. Holeman. In Off. Williams' deposition he stated Mr. Holeman looked straight ahead and never made eye contact with him. This is classic "*No Look*" conduct described by Caliber Press publications for individuals involved in criminal activity.

VII.  To reiterate from the paragraph above, it is sound police practice to pat frisk the occupants of a vehicle, before that vehicle is searched.[11]

---

[9] Charles Remsberg, *The Tactical Edge*, p.294-295, Caliber Press, October 1989 and the MCJTC's *Complete Traffic Stops Handbook*
[10] Charles Remsberg, *The Tactical Edge*, p.294, Caliber Press, October 1989
[11] Please see the attached MCJTC's *Complete Traffic Stops*

5