Once Ms. Smith was pat frisked the officers attempted to do the same to Mr. Holeman. Mr. Holeman clearly displayed uncooperative behavior, then made a rapid movement reaching for his front right trouser pocket and withdrawing a handgun. All individuals on scene confirm Mr. Holeman's menacing and obstinate behavior as factual.[12] Mr. Holeman's swift movement to his pocket may not have even been perceived by Off. Garcia had it not been for his insubordinate and antagonistic behavior immediately prior.

Mr. Holeman's insubordinate and antagonistic conduct was:

I.     As Mr. Holeman got out he appeared nervous, so apprehensive that Off. Garcia used his body to push against the door to control Mr. Holeman's exit speed out of the car.[13]

II.    Off. Garcia asked Mr. Holeman to put his hands on the car and Mr. Holeman did not respond.

III.   Mr. Holeman was asked a second time by Off. Garcia to put his hands on the car, again Mr. Holeman did not comply, but he held his hands over the car, this was in violation of two simple directions by a uniformed police officer.

IV.    Mr. Holeman refused to spread his legs apart, and kept turning around to face Off. Garcia,[14] a direct conflict with this Officer's directions and clearly an antagonistic posture to assume during a police encounter.

V.     According to Ms. Smith's statement to CSP investigators, Mr. Holeman was *"being very ignorant and was being a jerk about the whole thing."*

VI.    Mr. Holeman then said "*I will show you what I got in my pocket*" and made a sudden move for his right front pants pocket, eventually withdrawing a small semi-automatic pistol, which was then pointed at both of the Officers.

As Mr. Holeman was reaching for the contents of his pocket, Off. Garcia displayed outstanding patrol procedures training and experience by taking hold of Mr. Holeman's right arm and calling for Off. Williams to come over and assist him. This one act by Off. Garcia, most likely saved the lives of Ms. Rodriguez, Off. Williams as well as himself.

---

[12] The statements of Off.s Williams and Garcia, Ms. Smith and Ms. Rodriguez
[13] See Off. Garcia's statement to CSP investigators
[14] See the statements of Ms. Smith and Ms. Rodriguez

6

**The officers made every reasonable effort to use lower levels of force** on Mr. Holeman. The statements from area residents make clear that these two officers made every possible effort to stop Mr. Holeman's lethal actions. Only four of the area residents actually heard anything other than the gunshots. In the statements of these four civilians, all recall hearing deescalating commands from the officers. Leanne Darling, in her statement to investigators, advises that "*I then heard a male voice in a loud authoritative tone, put it down, put it down. The male voice was repeated about 5 times. The last couple of times the voice became excitable.*" According to the statement of Theodora MacQuilan, "*I could make out someone said drop it.*" And in the statements from James P. Renshaw and Yolanda D. Edwards, both report hearing shouts after they heard the gunshots.

It is obvious that both of these officers attempted to control Mr. Holeman with lower levels of force before resorting to deadly force. They attempted to physically disarm him; with Off. Garcia applying an arm bar on Mr. Holeman's right arm and Off. Williams utilizing a neck restraint and also gripping Mr. Holeman's left arm. It is due to Off. Williams' prolonged efforts to physically control Mr. Holeman that this Officer was shot in the arm. Off. Williams also deployed his police K-9 on Mr. Holeman before deadly force was utilized. However, this too was unsuccessful and did not stop Mr. Holeman from pointing his firearm at both officers. Clearly, all-reasonable force reducing options were attempted. Equally clear is the fact that Mr. Holeman violently refused to submit to these lower force options and was intent on murdering both of the officers.

Also to be considered is the fact that time and the lack of ballistic cover were critical components in Off. Garcia's decision to utilize deadly force. Off. Garcia received a radio transmission, reporting Mr. Holeman's criminal record at 4:32:47.[15] Off. Garcia radioed "*shots fired*" at 4:36:45. This left only a three minute and fifty-eight second window for the two officers to remove Ms. Smith and pat frisk her, then attempt to pat frisk Mr. Holeman. The fact that these officers were able to attempt three (3) de-escalation techniques (verbally ordering Mr. Holeman to comply with the pat frisk position, physically attempting to control and disarm Mr. Holeman, and deploying the K-9) is remarkable and points to outstanding training and the individual officer's mastery of their self-defense/patrol skills. However, due to the very dynamic nature of this confrontation, additional police personnel had not had an opportunity to arrive at the scene. Also due to the extremely close proximity of combatants in this encounter, combined with the incident's rapid evolution, there was no opportunity for the officers to retreat to a position of ballistic cover. These two factors and the act of Mr. Holeman pointing a firearm at Off. William's head, left Off. Garcia with no reasonable alternative but to draw and fire his service pistol and shoot to stop Mr. Holeman, despite the fact Off. Williams was locked in hand to hand combat with this subject. Had Off. Garcia delayed shooting, he would have placed Off. Williams in a  defenseless position against a homicidal offender armed with a handgun.

---

[15] See the CSP investigative report's timeline

**Supporting case law and national training standards on deadly force.** The Supreme Court's decision in Graham v Connor[16] ruled that excessive force must be analyzed under the Fourth Amendment's objective reasonableness test. The application of this test requires an analysis of the totality of the circumstances, including the below factors to determine if the seizure is reasonable.

I.    **The severity of the crime at issue.** At the point that deadly force was deployed, any reasonable officer would have believed that the crime was illegal possession of a handgun, resisting arrest, and actively attempting murder the two NLPD officers.

II.   **Whether the suspect poses an immediate threat to the safety of law enforcement officers or others.** Obviously the assaultive conduct displayed by Mr. Holeman understandably placed the officers[17] in grave jeopardy. The fact that Mr. Holeman refused to comply with the officers' control techniques, then pointed a firearm at each of the officers would lead a reasonable person to believe that Mr. Holeman intended to shoot the officers.

III.  **And whether the suspect is actively resisting arrest and to what extent.** The officers attempted every reasonable method of controlling Mr. Holeman. Attempts at physically controlling Mr. Holeman were tried, and the use of a police K-9 was tried; both failed. Clearly, Mr. Holeman violently resisted all of the officer's lower force options to control him, and then drew a pistol and pointed it at the officers, the ultimate level of offender resistance.

IV.   **Whether the suspect fled or attempted to evade arrest by flight.** One of the most alarming aspects of this incident is that Mr. Holeman made no attempt to flee; instead he selected to stand, draw a firearm and try to murder the officers.

The International Association of Chiefs of Police (IACP) provides suggested guidelines when considering the use of deadly force. Many police agencies in this country utilize these same guidelines for preparing their use of deadly force policies and also to review shootings within their departments. I have listed below the IACP's guidelines for an examination of the facts and circumstances of the Holeman shooting:

I.    **The nature of the crime committed by the person confronting the officer.** Clearly, Mr. Holeman had illegal possession of a firearm[18] and showed a keen willingness and propensity to use this lethal weapon against the NLPD officers. At the point police deadly force was used, Mr. Holeman was attempting to murder a police officer (Off. Williams) by pointing a pistol at his temple.[19]

---

[16] Graham v Connor 490 US 356 (1989)
[17] See Off. William's statement on page 5 of the CSP investigation
[18] See the statements of the New London EMTs and Ms. Smith and Ms. Rodriguez
[19] See Off. Garcia's statement in the CSP investigation

II.    **The nature of the verbal or physical threats on the part of the person confronting the officer.** Mr. Holeman was uncooperative immediately upon being asked to step out of the Acura. This is according to his companion, Ms. Smith, in her signed statement she advises, "*The officers actually had to put 'D's' hands on the hatchback area of my car because 'D' wasn't being co-operative at all.*"[20] Mr. Holeman turned and faced Off. Garcia, rather than comply with the orders to put his hands on the Acura. This clearly was a confrontational move by Mr. Holeman. Ms. Smith also stated to the CSP investigators that "*At this time 'D' was actively putting up a fight and I felt that he was out of control.*" And lastly, Ms. Smith stated to the CSP investigators "*I think I heard one of the officers say he's got a gun.*"

III.   **The number of officers versus the number of _potential_ assailants.** In this case two officers were confronted by a large, fit offender, armed with a firearm, displaying aggressive, mobile and homicidal behavior. Ultimately, Ms. Smith appears to have fully cooperated with the officers. However, at the time Off.s Garcia and Williams were struggling with the armed Mr. Holeman, they had to consider Ms. Smith a threat and monitor her as well. The civilian ride-a-long, Ms. Rodriguez, considered Ms. Smith a threat[21] and did not allow her into the NLPD vehicle. That fact that the NLPD officers had to concern themselves with two (2) possible offenders reduced their survival odds considerably. This encounter was clearly a high-risk situation and the officer's attention had to be divided between Ms. Smith and Mr. Holeman. According to Greg Connor's Control Superiority Principle[22], law enforcement personnel should strive for maintaining a greater number of officers than offenders when uncooperative subjects are confronted. Further, nearly a third of all officers killed on duty are killed by multiple offender encounters[23].

IV.    **The relative strength and fighting skills of the officer and his opponent.** Mr. Holeman was not able to be controlled with empty hand techniques or a police canine. When dealing with an armed individual, trainers agree that the only reasonable response is a firearm.[24] According to the Greg Connors' force continuum[25], a firearm is the reasonable officer's response to a subject posing the threat of serious bodily injury or death. Also to be considered was the lack of ballistic cover for the officers and the extremely close proximity of Off. Williams to Mr. Holeman.

---

[20] See statement of Ms. Smith to the CSP investigators
[21] See Ms. Rodriguez's statement where she denies Smith's request to get into the police cruiser
[22] The Connors force continuum is currently utilized by all of the U.S. armed forces, nearly all of the U.S. federal law enforcement agencies and numerous states, including Massachusetts.
[23] FBI Crime Statistics Management Unit and William A. Geller's *Deadly Force* p.225, Police Executive Research Forum 1992
[24] Ronald J. Adams, Street Survival, "Confrontation", pp. 24-43, Calibre Press, 1983
[25] Ibid. #20

9

V.  **The nature of weapons in the possession of, or available to the
    assailant.** The handgun is the most commonly used murder weapon in this
    country.[26] Further, the handgun is responsible for more than three-fourths of
    all police officer murders.[27] The officers not only had to stop Mr. Holeman's
    armed attack on them, but also had to consider the possibility that Ms. Smith
    may join his assault on them.

VI. **The ability to avoid the potential effect of OC spray.** Oleo Resin
    Capsicum (OC) or pepper spray was not a viable option for these officers.
    First, this tool is considered a compliance technique by law enforcement
    trainers,[28] to be used against <u>unarmed</u> physical resistors. With an armed and
    aggressive offender, OC is far too low on the force continuum and ineffective
    against a firearm attack, it also places the officer in exceptional jeopardy.
    Secondly, the effective range of individual officer's issued OC spray is 4' to 6',
    and it must be sprayed directly into the offender's face. These Officers were
    within touching distance from Mr. Holeman and wrestling with him, while he
    was pointing a handgun at them. To have attempted to disengage from Mr.
    Holeman and apply OC spray, while Mr. Holeman had a firearm aimed at them
    certainly would be impractical and would have resulted in the death or serious
    injury to the officers. Further, to somewhat contain Holeman's movements,
    Officer Williams was holding onto him, increasing the risk of collateral
    contamination to Off. Williams. This would have incapacitated Off. Williams
    leaving him defenseless to Mr. Holeman's gunfire.

VII. **The alternative means of defending against the use or effect of the
     OC spray.** OC spray was not an option for these officers when the facts and
     circumstances of this incident are considered. Please see # VI.

VIII. **The availability of assistance from other nearby officers.**
      The involved officers, due to the rapid evolution of events, did not have the
      opportunity to summons additional personnel to the scene. Within 3 minutes
      and fifty-eight seconds this encounter turned from an unknown-risk motor
      vehicle stop (or even a community caretaker stop) to a deadly force
      encounter, with the officers fighting for their lives. This was due to the highly
      aggressive conduct displayed by Mr. Holeman and the speed in which this
      incident evolved. The officers correctly responded by immediately attempting
      to stop Mr. Holeman's lethal firearms assault on them and did not have an
      opportunity to call for additional personnel until the lethal threat was stopped.
      Off. Garcia was forced into a situation where he had to fire his service pistol
      immediately in order to save his life and the lives of Officer Williams and Ms.
      Rodriguez. Had Officer Garcia attempted to make a radio transmission as
      this encounter was turning from an unknown risk stop to a lethal encounter, it
      would have provided Mr. Holeman with the opportunity to discharge his

---

[26] FBI *"Law Enforcement Officers Killed Summaries"*
[27] William A. Geller's Deadly Force p. 186, Police Executive Research Forum 1992
[28] Airco International OC Aerosol Training Manual and MA CJTC's OC Training booklet

weapon. These two officers were so deeply involved with acts designed to survive this encounter that help was only summonsed by Ms. Rodriguez, who was observing from Off. Garcia's cruiser.[29]

The Federal Bureau of Investigation's (FBI) and the International Association of Chiefs of Police (IACP) deadly force policies were drawn from the IACP's suggested model penal codes, Sections 3.07 and 3.09. They require the following threat perceptions to take place if deadly force is to be employed:

I.     The offender must have the **ability** to cause serious bodily injury or death.

II.    And the offender must have the **opportunity** to cause serious bodily injury or death.

III.   And the offender's threat must place the Officer's **life or the life of another in imminent jeopardy**.

IV.    And there must **no other reasonable alternative.**

In this incident all four deadly force factors were present at the time Officer Garcia fired his service pistol. First, Mr. Holeman had the **ability** to cause death or serious bodily injury, he demonstrated his physical prowess to quickly pull a pistol out his pocket while in Off. Garcia's arm bar.[30] Mr. Holeman's ability to cause death or serious injury was greatly multiplied by his firearm and his demonstrated willingness to use this weapon (pointing it at both officers). Also to be considered is the fact that Off.s Garcia and Williams had attempted to control and disarm Mr. Holeman and he was sufficiently skilled and motivated to avoid their disarming/controlling techniques.

Off. Garcia attempted the common controlling technique called an arm bar combined with verbal techniques. For Off. Garcia to turn his back to run from Mr. Holeman would have placed this officer in additional jeopardy due to the lack of ballistic cover available and by not being able to utilize his use of force tools and empty hand techniques to defend himself. This would also completely discount current police training in defensive tactics as well as civilian martial arts training. Mr. Holeman shouted the phrase "*I will show you what I got in my pocket!*"[31] as he began pulling the firearm out. Mr. Holeman's lack of cooperation, proximity and actions would lead any reasonable officer to know that the **opportunity was present** for their life to be in danger when Mr. Holeman withdrew a handgun from his pocket.

---

[29] See statements to CSP investigators by Off. Garcia and Ms. Rodriguez
[30] Off. Garcia's statement on page 8 of the CSP investigative report
[31] Ibid. #30

Off.s Garcia and Williams were in **imminent jeopardy of death or serious injury.** Handguns are the most common weapon used to murder police officers each year In the United States; 13 out of 20 murder victims are killed with handguns, making them the number one weapon in this country.[32]

Lastly, there was **no reasonable alternative** for Off.s Williams and Garcia. The officers had a duty and obligation to their community, to Ms. Smith and Ms. Rodriguez, as well as to themselves to stop, control and arrest Mr. Holeman. Oleo Resin Capsaicin (OC) or pepper spray was not a viable option for these officers. First this tool is considered a compliance technique by law enforcement trainers,[33] to be used against unarmed physical resistors. With an armed and aggressive offender OC is far too low on the force continuum and ineffective against a firearms attack. Greg Connors, one of the leading use of force trainers in this country has coined a phrase in his force continuum called the "*Control Superiority Principle*". This principle is based on the **Graham v. Connor** case, which calls for objectionable reasonable force to be applied to law enforcement resistors. In the Control Superiority Principle law enforcement personnel should have a recognized advantage when dealing with a resistor. In this incident the only available and authorized advantage to the two NLPD officers were their firearms. It would have been unsafe and against national law enforcement training standards to bring OC or a baton to a gun confrontation. The officers made every conceivable effort to use lower levels of force. Mr. Holeman clearly was not willing to submit to their uniformed presence, to the officer's verbal directions/orders and to their de-escalation techniques (refused to place his hands on the Acura, refused to be positioned for a pat frisk, the calling Off. Williams over to assist, an arm bar applied by Off. Garcia or the headlock and arm hold by Off. Williams, and the deployment of a police K-9).

In conclusion, Mr. Holeman's death was the direct by-product of his homicidal behavior. He had numerous options available that he could have utilized rather than force a police deadly force response, they are:

I.      Mr. Holeman could have complied when he was first contacted by the uniformed officers and obeyed their lawful directions to put his hands on the Acura and spreading his feet apart.

II.     Mr. Holeman could have submitted to the officer's de-escalation techniques, when the officers tried to knock the gun from his hand, submitted to the officer's control techniques or submitted when the police K-9 was deployed. Mr. Holeman could have chosen not to threaten the lives of the officers by pointing his handgun at them during this confrontation. Even after Mr. Holeman had been shot, **two (2) times** he still remained menacing and uncooperative. Mr. Holeman could have stopped resisting and obeyed the commands of

---

[32] FBI "Law Enforcement Officer Killed" Summaries and UCR statistics on violent crime in the USA as taken from Geller's *Deadly Force*

[33] Mass Criminal Justice Training Council Defensive Tactics training manual, Airco International

Off.s Williams and Garcia to "*show me your hands!*" Off. Williams was required to strike Mr. Holeman and deploy his K-9 before he would show them his hands. Even when being treated by the New London EMTS, Mr. Holeman remained combative and aggressive, refusing to be treated.[34]

III.    When initially stopped and during the confrontation, Mr. Holeman could have attempted to flee from the officers, as most individuals do when involved in criminal activity and confronted by law enforcement officials. It is common knowledge among offenders that most fleeing subjects can run faster than an officer wearing a heavy gun belt, a bullet resistant vest, boots and a cumbersome uniform. Most alarming to me was that Mr. Holeman resisted every effort these officers utilized to control him and then remained on-scene in an attempt to murder both of the officers.

**New London Police Department's Training Program** provides its officer's with innovative training skills that are critical to success during hazardous encounters with offenders. The simunitions training provided to the NLPD officers in 1998[35] allowed non-lethal ammunition to be fired out of their actual service pistols. This then allows officers to engage in realistic training scenarios with their actual weapons, while shooting at moving human role players rather than stationary paper targets. Simunitions police training is just now, in 2003, becoming common. Even now many law enforcement agencies have not incorporated this innovative training method into their firearms programs. Further, it is universally agreed that simunitions training is not only critical in the event of a court challenge but also a highly effective training technique for police officers.

Also found in the NLPD firearms training program were classes exclusively focused on when to shoot. Far too many law enforcement agencies stress marksmanship, reloading and malfunction drills and not the critically important aspect of recognizing when to shoot. NLPD identified this vital use of force training component and provided its officers with numerous classes designated solely for this purpose.[36]

NLPD also offered other outstanding training at its in-service programs, which were attended by Off.s Williams and Garcia, prior to the shooting incident. These classes were:

**Verbal Judo**; a program designed to deescalate volatile situations and individuals verbally.
**Patrol procedures**; a block that discussed stopping suspicious individuals and other high risk encounters.

---

[34] See the statements submitted by the New London EMTs that responded to the Holeman shooting scene in the CSP investigative report
[35] See the NLPD training records for both Off.s Williams and Garcia
[36] Ibid. #31

13

**Crimes in progress;** a block of instruction on how to respond safely and effectively to on-going incidents.
**Tactical use of weapons;** the realistic deployment of weapons during armed encounters. NLPD is thinking "outside the box" and not simply providing basic marksmanship training.

It must be noted that I have only identified the in-service training that applies to violent encounters. NLPD offered not only the above classes but also significant additional instruction in all facets of law enforcement[37] Clearly NLPD was sending its officers into the field fully prepared for all aspects of duty.

**New London Police Department's supervision** during the Holeman shooting was appropriate and within accepted guidelines. Sergeants were on scene within minutes, the NLPD command staff was notified immediately and the Connecticut State Police (CSP) major crime squad was notified and responded to investigate.

A review of previous use of force encounters by both officers reveals that their force was documented and reviewed by superior officers, this is in accordance with nation wide law enforcement standards.[38] It also is clear that the command staff at the NLPD completed appropriate investigations regarding past allegations of improper or excessive force and appropriate corrective steps were taken if the accusations were sustained.

Respectfully submitted,

Daniel C. Wicks

---

[37] See the CT POST standards for 1999, NLPD exceeded the minimum standards required
[38] Two examples are the Massachusetts State Police and the Waltham, MA Police Department, both require similar review by supervisors.

14

Exhibit C



RECEIVED
FEB 05 2004
BY:_____

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARION HOLEMAN AND : | CASE NO. 3:00-CV1608 (DJS) |
| WALLACE HOLEMAN : | |
| ADMINISTRATRIXES OF THE ESTATE : | |
| OF DARRELL HOLEMAN : | |
| Plaintiffs : | |
| : | |
| VS. : | |
| : | |
| CITY OF NEW LONDON, : | |
| NEW LONDON POLICE DEPARTMENT, : | |
| GASPAR VINCENT GARCIA, : | |
| BRUCE RINEHART, GREG WILLIAMS : | |
| AND JOHN DOE : | |
| Defendants : | JANUARY 26, 2004 |

### RE-NOTICE OF DEPOSITION

TO:    Lieutenant Daniel C. Wicks
29 Chelmsford Road
Bedford, MA 01730

PLEASE TAKE NOTICE that pursuant to Practice Book § 13-26 et seq.,

the Plaintiffs will take the deposition of the expert witness Lieutenant Daniel C.

Wicks, on February 10, 2004 at 10:00 a.m., before Shea & Driscoll, LLC or other

competent authority at the Law Offices of Howd and Ludorf, 65 Whethersfield

Avenue, Hartford, Connecticut.

**Sandy M. Moore, Attorney at Law**
60 Broad Street, New London, CT 06320
Ph: (860) 444-6124  Fax: (860) 701-0492
Fed. No. CT-19322

Said deposition will continue day to day until concluded.

THE PLAINTIFFS
MARION HOLEMAN AND
WALLACE HOLEMAN
ADMINISTRATRIXES OF THE
ESTATE OF DARRELL
HOLEMAN

BY: _____

Attorney Sandy M. Moore
80 Broad Street
New London, CT 06320

### Schedule A

1.  Your entire file including but not limited to all notes, memorandum, reports, letters, documents, films, videotapes, tests, trial exhibits, photograph and other tangible things you have relating to the incident occurring on August 22, 1999, that is the subject of the above-captioned lawsuit.

2.  Any and all materials relied upon in your investigation and/or used in formulating your opinions and conclusions that in any way relate to or concern the above-mentioned incident which occurred on August 22, 1999

3.  All referenced materials, charts, learned treaties, standards, procedures, indexes, reports, handbooks provided to you, recommended by you, reviewed, consulted references, relied to your search, analysis, investigation, consultation or preparation of this lawsuit or other subject matter thereof.

4.  Any and all documentation or records which reflect the activities undertaking the time spent, and the amount charged by you in your work in this matter.

5.  A list of all cases in which you have given testimony including the name of the case, the date of your deposition or court testimony, names of the parties involved, and names and addresses of the attorneys involved.

6.  The most updated version of your Cirriculum Vitae or Resume.

## **CERTIFICATION**

I hereby certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the foregoing counsel of records this 26th day of January 2004.

Jeffery T Londregan
Conway & Londregan
38 Huntington Street
P.O. Box 1351
New London, CT 06320-1351

Daniel C. DeMerchant
Howd & Ludorf
65 Whethersfeild Avenue
Hartford, CT 06114

Richard Hustad Miller
P.O. Box 365
Uncasville, CT 06382

_____
Commissioner of the Superior Court

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


MARION HOLEMAN, ET AL          :
                               :  NO:  3:00CV1608(DJS)
V.                             :

CITY OF NEW LONDON, ET AL      :  JULY 29, 2003


DEPOSITION OF:  NOEL F. MCGREGOR
taken at
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, Connecticut


APPEARANCES:

Representing the Plaintiffs:

        Law Offices of
        SANDY MOORE
        80 Broad Street
        New London, CT
        BY:  SANDY M. MOORE, ESQ.
        (860) 444-6124


Representing the Defendants:

        HOWD & LUDORF
        65 Wethersfield Avenue
        Hartford, CT  06114-1190
        BY:  DANIEL C. DEMERCHANT, ESQ.
        (860) 249-1361


IN ATTENDANCE:
Wallace Holeman




Keli McGilton
Licensed Court Reporter-00088/Notary Public
NIZIANKIEWICZ & MILLER REPORTING SERVICES

48

1              It's a subpoena in this court case.  It's

2              a two-page document.

3     Q.   (By Mr. DeMerchant)  Mr. McGregor, did you

4     review this document when you received it?

5     A.   I reviewed it, yes.

6     Q.   Did you review the second page

7     entitled "Schedule A"?

8     A.   No, I did not.

9     Q.   Can you review that here, please?

10    A.   Yes.

11    Q.   You've brought your file here today with

12    you?

13    A.   Yes, sir.

14    Q.   Now, is that your complete file?

15    A.   Yes.  This is information that I reviewed.

16    Q.   The information you reviewed for purposes

17    of this matter?

18    A.   Yes.

19    Q.   Is there any material that you have not

20    produced under a claim of privilege?

21    A.   No.

22    Q.   So is it fair to say that this information

23    also includes all the information, letters and

24    correspondence that you received from Attorney

25    Moore's office?

1       A.    No, I don't have that.  You mean, like, as

2   far as -- no, I don't have any of that.  I didn't

3   bring that.

4       Q.    Where's that information?

5       A.    I don't have it.

6       Q.    That's not part of your file?

7       A.    No.

8       Q.    Let's go through the subpoena, Mr.

9   McGregor, if we may.  Schedule A, number one -- you

10  all set?

11      A.    Yes, I have a copy.

12      Q.    I want to make sure you're listening.

13      A.    Uh-huh.

14      Q.    "Your entire file including, but not

15  limited to, all notes, memoranda, reports, letters,

16  documents, films, videotapes, tests, trial exhibits,

17  photographs and other tangible things you have

18  relating to the incident which occurred on August

19  22, 1999, that is the subject of the above-captioned

20  lawsuit."

21      A.    Okay.

22      Q.    You've brought all that with you today?

23      A.    Accept for I didn't keep notes.  Once I

24  had my final report in form, I didn't keep notes

25  because it wasn't like an investigation, so I didn't

50

1    keep them for that.  There was no films, videotapes,

2    photographs that I used myself, took myself, just

3    photographs that were provided for me.  The only

4    exhibit I have is a map of the City of New London.

5         Q.    These notes that you made, they're

6    destroyed?

7         A.    Some of them are because I wrote the notes

8    out and then made a report.  I may have some there.

9    I don't remember if I have any left.

10        Q.    You don't recall whether or not you have

11   any notes?

12        A.    No.

13        Q.    But you may have notes at your place of

14   business?

15        A.    I may have.

16        Q.    Well, could you produce those reports,

17   please, if you do have them?

18        A.    Yes, I will.

19             MR. DEMERCHANT:  Are you going to

20             object?

21             MS. MOORE:  Object as to form.  He

22             did add on there if he had them, so that's

23             fine.

24             MR. DEMERCHANT:  Obviously, if he

25             doesn't have them in his possession, it's

1    A.   It was for background information to help

2    substantiate my opinion.

3              MR. DEMERCHANT:  Excuse me for one

4              second.

5

6              (A recess was taken)

7

8              MR. DEMERCHANT:  Back on the record.

9    Q.   (By Mr. DeMerchant)  "U-S-G-O-V-I-N-F-O

10   Website."  Do you see that, sir?

11   A.   Yes.

12   Q.   "Miranda Rights of Silence."  What is

13   that?

14   A.   That's a U.S. Government information

15   site.  It has articles and information.

16   Q.   And you used that to assist you in

17   rendering your opinions in this case?

18   A.   For background information.

19   Q.   What type of background information?

20   A.   On rights of citizens versus police stops.

21   Q.   Did you print out any of that information?

22   A.   I may have.  I would have to double-check

23   on that.

24   Q.   If you do find that information, could you

25   provide that to me, please?

99

1      A.    Yes, sir.

2      Q.    "California Police Officers Association,

3  Use of Force."  What is that?

4      A.    Another website that I got information on

5  the use of force and force continuum.

6      Q.    And did you utilize information from that

7  internet source to assist you in rendering your

8  opinions in this matter?

9      A.    For background information, yes.

10     Q.    What kind of background information?

11     A.    I believe they had use of force continuum

12  and how the force continuum should be used.

13     Q.    Whose use of force continuum?

14     A.    That was on this site.  It was says

15  California, but I believe it was a national force

16  continuum.  I can't remember offhand.  I don't have

17  it in front of me.

18     Q.    National force continuum?

19     A.    Yes.  I'm saying it may have been.

20     Q.    Does the IACP put out recommendations as

21  far as use of force continuum?

22     A.    I'm not sure.

23     Q.    Have you ever heard of Calabrie Press

24  before?

25     A.    Calabrie Press?

100

1        Q.    Calabrie Press.   Have you ever heard of

2    that before?

3        A.    No, sir.

4        Q.    Have you ever heard of the term CALEA, the

5    acronym CALEA, C-A-L-E-A?

6        A.    Yes, I believe so.

7        Q.    What is that, sir?

8        A.    California Law Enforcement Association.

9    I'm not sure.

10       Q.    "New York Times New Yorker," what is that,

11   sir?

12       A.    That was an article on the Miami police

13   incidents, I believe.

14       Q.    So that phrase following "Bad Cops by

15   Peter Boyer, Miami Herald Article," that's part of

16   the New York Times New Yorker?

17       A.    No.   I think it's two separate.

18       Q.    But there's a semicolon in between those,

19   right?

20       A.    Yes.

21       Q.    So the New York Times New Yorker, what is

22   that?

23       A.    That was an article.   I don't remember.   I

24   may have it.

25       Q.    Do you recall the name of that article?

1        A.    Not at this moment, sir.

2        Q.    Because the New York Times New Yorker,

3    that's a publication; is that correct?

4        A.    Yes.

5        Q.    Do you have that article in your

6    possession or, I should say, back at your business

7    office?

8        A.    I may have.

9        Q.    Could you provide that to me, if you do

10    have that?

11        A.    I will try to find that.

12        Q.    And did you use that article from the New

13    York Times New Yorker to assist you in your opinions

14    in this matter?

15        A.    That would have been background

16    information.

17        Q.    You keep saying "background information."

18    What is background information in relation to what

19    may have assisted you in rendering your opinions in

20    this case?

21        A.    Well, background information would be

22    information I would use to substantiate and to

23    reinforce my opinion.

24        Q.    Substantiate and reinforce your opinion.

25    What do you mean by reinforce your opinion?

1      A.    I have an opinion based on my years of

2   experience as a police officer, and I would do

3   research on my opinion and see if that information

4   that I, based on my experience, have come up with

5   that I would just use the information to say, oh,

6   yes, these things are happening and I believe have

7   happened.

8      Q.    Is it fair to say that you use this

9   information to see if it's happening elsewhere in

10  the United States?

11                MS. MOORE:   Objection as to form.

12                THE WITNESS:   Yes.

13     Q.    (By Mr. DeMerchant)   "Bad Cops by Peter

14  Boyer, Miami Herald Article, Naples Daily News."   Do

15  you see that, sir?

16     A.    Yes.

17     Q.    Is that in your file?

18     A.    Yes, sir.

19     Q.    That does sound familiar.   We discussed

20  that article, right?

21     A.    Yes.

22     Q.    "Associated Press Articles, Oakland

23  Tribune Article and ABC ActionNews.Com."

24     A.    Yes.

25     Q.    Let's start of with "Associated Press

1   Articles."  What is that, sir?

2       A.   Those are articles, once again, that I

3   researched on the internet pertaining to my opinion.

4       Q.   Do you have those articles with you

5   presently?

6       A.   No, sir.

7       Q.   Do you have those articles back in your

8   office?

9       A.   I will see if I do.

10       Q.   If you do you have those, please provide

11   those.

12       A.   Okay.

13       Q.   "Oakland Tribune Article."  Do you see

14   that there, sir?

15       A.   Yes.

16       Q.   What is that?

17       A.   The same article that I used for

18   background information.

19       Q.   What are these articles, sir?  I mean,

20   what subject are these articles?

21       A.   Some of the articles are on police stops,

22   police use of force continuum, incidents involving

23   police and procedures.  Some articles were when

24   police are arrested for misuse of power.  Some were

25   for illegal stops.

238

1          MR. DEMERCHANT:  Objection.

2          THE WITNESS:  That is correct.

3     What time is it?

4          MR. DEMERCHANT:  Off the record.

5

6          (Off-record discussion)

7

8          MR. DEMERCHANT:  Back on the record.

9     Obviously, you're not done with your

10    cross-examination, and I have a few more

11    questions after your examination.  I was

12    also planning on adjourning this

13    deposition on the basis that I didn't

14    receive all of the information that was

15    subject to the subpoena, and I was going

16    to reserve it, also, for questions

17    concerning the documentation.  It might be

18    prudent at this point to just adjourn the

19    deposition, and we'll pick up where you

20    left off your examination.  I don't have

21    much more on your questioning based on

22    what I've heard so far, but it sounds like

23    we do need at least another hour at the

24    max.

25          MS. MOORE:  All right.  When did you

241

1         UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2

3         I, Keli McGilton, a Notary Public in and for
    the State of Connecticut, do hereby certify that
4   there came before me on the 29th day of July, 2003,
    at the offices of HOWD & LUDORF, 65 Wethersfield
5   Avenue, Hartford, Connecticut, the following named
    person, to wit:  NOEL F. MCGREGOR, who was by me
6   duly sworn to testify to the truth and nothing but
    the truth as to his knowledge touching and
7   concerning the matters in controversy in this cause;
    that he was thereupon examined upon his oath and
8   said examination reduced to writing by me; and that
    the statement is a true record of the testimony
9   given by the witness, to the best of my knowledge
    and ability.
10

11        I further certify that I am not a relative or
    employee of counsel/attorney for any of the parties,
12  nor a relative or employee of such parties; nor am I
    financially interested in the outcome of the action.
13

14        WITNESS MY HAND this 3rd day of August, 2003.

15

16

17                              _____
                                  Keli McGilton
18                                Notary Public

19

20

21

22

23

24
    My Commission expires:
25  July 31, 2007