# GROTON TOWN POLICE DEPARTMENT
## SUPPLEMENTAL REPORT

| | |
|---|---|
| **CASE   NUMBER:** | 96-01650 |
| **DATE  &  TIME:** | 07-FEB-96   1255 HRS. |
| **OFFICER ASSIGNED:** | LT. M.MORTON |
| **INCIDENT:** | MAN WITH A GUN |
| **CASE   STATUS:** | 7 |

Exhibit 10

=========================================================

On this date I received a phone call from Inspector Jack Edwards of the Conn. State's Attorney's Office requesting that I take custody of a 9-1-1 tape recording of the 9-1-1 call made from IHOP on Rt.12 in Groton on January 28, 1996 regarding the "man with a gun" incident.

I obtained from the 9-1-1 Dispatch Center their tape identified as #144 (blue) which recorded the 9-1-1 call from IHOP on 1/28/96. This tape is a BASF T-160, 8-hr. video tape used by the 9-1-1 Dispatch Center to record their calls. I marked this tape with Evidence Tag #904-1.

I had previously recorded the conversations from this 9-1-1 tape on a Realistic MC-60 microcassette tape for ease of listening.

**Lt. Matthew Morton**                    Supervisor:

COPY

# GROTON TOWN POLICE DEPARTMENT PROPERTY REPORT

| | Case # |
|---|---|
| | #96-01650 |
| | Status |
| | 7 |

| Report Date | Type of Case |
|---|---|
| 07-FEB-96 | Man With A Gun |

**Property Code**  A = Abandoned    F = Found    L = Lost    R = Recovered    S = Stolen    O = Other

| Code | Tag # | Evidence Y/N | QTY | Descriptive Narrative Make, Model, Color Size, Distinguishing Marks | Serial No. | Value | EC |
|---|---|---|---|---|---|---|---|
| O | 904-1 | Y | 1 | 9-1-1 BASF T-160 Videocassette tape | #144(Blue) | ----- | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | TOTAL | $ -0- | |

TELETYPE #'s

## BICYCLE

| Code | Tag # | Brand | Model | B/G | Speed | Size | Color | OAN | Serial No. | Value |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $ |

DESCRIPTION:

COPY

Person Reporting Property Lost or Stolen

| SIGNATURE | DATE | Officer Code | Shift Commander |
|---|---|---|---|
| | | MORIN | |
| WITNESS | DATE | | |



## GROTON TOWN POLICE DEPARTMENT
## SUPPLEMENTAL REPORT

CASE   NUMBER:        96-01650                    Exhibit 1P
DATE  &  TIME:        29-FEB-96   1630 HRS.
OFFICER ASSIGNED:     LT. M.MORTON
INCIDENT:             MAN WITH A GUN
CASE   STATUS:        -8-

================================================================

    On this date information was received that the State's
Attorney's Office had reviewed the case regarding Gaspar Garcia and
that as a result there did not appear to be sufficient evidence to
proceed further with the case.


    CASE CLOSED.



Lt. M.Morton                          Supervisor:




1   the protective Schedule A schedule of underlying policies.

2   And then it says, "Supervisor complaint form."

3                   MR. DeMERCHANT:  If I may, Sandy, I might

4           clarify something.  That's a complete packet of

5           everything we sent to your office with respect to

6           your first set of production requests.

7                   MS. MOORE:  Oh, I see.  That's why it's

8           altogether.

9                   MR. DeMERCHANT:  It's not just one

10          separate --

11                  MS. MOORE:  One separate thing, yeah.  Okay.

12          Thanks.  That helps a lot.  I'm not going to go

13          through this.

14      Q   Is that form, did you review that civilian

15  complaint form?  Or is that a civilian complaint form?

16  What is that?

17      A   It's titled "Supervisor's complaint report."

18      Q   And did you read that in conjunction with coming

19  to your opinions with regard to the shooting death of

20  Darrell Holeman?

21      A   Just give me a moment.  Yes, I did.

22      Q   And when you read this form -- and actually when

23  you read that form, can you tell me -- first of all, tell

24  me what that form is again?

25      A   It's titled "Supervisor's complaint report."

Exhibit 2

1    Q    And who is the person that's being complained of

2  there?

3    A    It would be Gaspar Garcia.

4    Q    And that's the officer that was the shooter in

5  this case?

6    A    Yes, ma'am.

7    Q    And when you say, "Supervisor's complaint form,"

8  what does that mean as opposed to a civilian complaint

9  form?

10    A    I believe it was an internally generated

11  document.

12    Q    And what does his supervisor complain of in that

13  document?

14    A    An incident occurred in Groton, Connecticut,

15  while Officer Garcia was off duty.

16    Q    Go on.

17    A    I'm not sure what you want me to go on with.

18    Q    Well, did you review that fact pattern?

19    A    I did.

20    Q    So what happened during this off-duty incident?

21    A    I assume it was in the early morning hours.  I

22  don't know the exact time.  Him and a young lady were at an

23  International House of Pancakes restaurant when Officer

24  Garcia observed an individual striking a female and he

25  intervened.

1     Q    And when you say he intervened, do you know what

2  he did?

3     A    Yes.  He ordered the gentleman to stop striking

4  the female.  The gentleman was a large person.  I believe

5  he was 6 feet, 220 pounds.  And he started to come towards

6  Officer Garcia in a threatening manner.

7     Q    And do you know what else happened?

8     A    Yes.  Officer Garcia drew his firearm.  An

9  off-duty firearm.

10     Q    And is that all you know about the incident?

11     A    I believe I know some more information.

12     Q    What more information do you know?

13     A    He kept the firearm at the low ready.  Once

14  confronted with the firearm, the individual left the area,

15  and Officer Garcia advised a Groton Police Department

16  dispatcher of what had occurred.

17     Q    And do you know what happened with regard to

18  discipline of Officer Garcia after this event?

19     A    I believe I do, yes.

20     Q    Do you believe Officer Garcia's use of force in

21  this incident was reasonable?

22     A    No, I don't.

23     Q    And what was the discipline that Officer Garcia

24  received?

25     A    I believe he was required to review the policy on

1    nondeadly force.

2        Q    And where did you read that?

3        A    In that package.

4        Q    Because I didn't read that.  I just want to make

5    sure I get that.

6        A    I don't see that anywhere in this document.

7        Q    Well, is it anywhere in any of the papers that

8    you reviewed that Officer Garcia received any discipline?

9        A    I don't recall where I read it.

10       Q    And in all your twenty years of experience, would

11   that have been a discipline you levied against Officer

12   Garcia against that incident?

13                MR. DeMERCHANT:  Objection.

14       A    I'm not sure I understand what you're asking me.

15       Q    Well, let's say that you are Lieutenant Lacey and

16   this same information occurred, the same incident occurred,

17   would that be proper discipline?  What would be the proper

18   discipline of Officer Garcia as you see it in your

19   experience?

20                MR. DeMERCHANT:  Objection.

21       A    For this matter?

22       Q    For the International House of Pancakes.

23       A    I think that it would be appropriate some

24   remedial revision of the use of force policy, deadly and

25   nondeadly force.

1    Q    And were you aware when you read this document

2    that Officer Garcia had been frequenting a local nightclub

3    just prior to this incident?

4    A    Yes.

5    Q    And were you aware at that point that he was

6    consuming alcohol at that local nightclub?

7    A    Yes.

8    Q    And are you aware that Groton Town police sought

9    a warrant for Officer Garcia's arrest?

10   A    Yes.

11   Q    And are you aware by looking at the documents

12   that Officer Garcia first lied about pulling a pistol?

13             MR. DeMERCHANT:  Objection.

14   A    No, I was not aware of that.

15   Q    Well, had you been aware that Officer Garcia lied

16   about pulling a weapon initially, a gun initially, what

17   would have been the steps that you would have taken as his

18   superior officer?

19             MR. DeMERCHANT:  Objection.

20   A    I'm familiar with the facts and circumstances

21   that you've mentioned to me, other than the fact that he

22   said he didn't pull a gun.  I was not aware of that.  I

23   would need to review this additional information before I

24   could form an opinion.

25   Q    Well, let's assume that he -- just for the sake

1  of hypothetical -- that Officer Garcia initially lied to

2  the police and indicated that there was no gunplay, that he

3  did not use a weapon.  What would have been your discipline

4  of him if you later found out that he had used a weapon, or

5  at least drew a weapon, and he had lied about it?

6                    MR. DeMERCHANT:  Objection.

7       A    I just want to be accurate in my response.

8  You're asking me hypothetically if during an encounter with

9  an unarmed individual he drew a weapon, and then when

10 confronted about it by his superiors, he denied it?

11      Q    When confronted by the Groton Town police, the

12 police in that jurisdiction where the weapon was drawn, he

13 lied about that.

14                   MR. DeMERCHANT:  Objection.

15      Q    What would be your course of action?

16      A    I think that a more severe punishment than

17 reviewing the policy would be required.

18      Q    And what would be the severity of that

19 punishment?

20                   MR. DeMERCHANT:  Objection.

21      A    If you were on the Massachusetts State Police?

22      Q    Uh-huh.  Yes.

23      A    A letter would have been placed in his file

24 enumerating all that to be kept there for a permanent

25 period of time.

1    Q    And you said you were aware that the Groton

2    Town -- would that be the end of it?  That would be the

3    extent of the severity of his punishment?

4              MR. DeMERCHANT:  Objection.

5    Q    And what about the fact that he had been

6    consuming alcohol?  Would that have come into play with

7    regard to your discipline that you would have initiated?

8              MR. DeMERCHANT:  Objection.

9    A    If the facts and circumstances were identical as

10   they are now?

11   Q    Uh-huh.

12   A    No.

13   Q    So it didn't matter that he had been drinking

14   prior to pulling this weapon?

15             MR. DeMERCHANT:  Objection.

16   A    While looking at his conduct no, it was not a

17   factor.

18   Q    Well, when an individual lies to the police with

19   regard to the circumstances concerning an event that the

20   police are investigating, would that person be charged with

21   obstruction --

22             MR. DeMERCHANT:  Objection.

23   Q    -- normally?

24   A    I think that each and every case has to be looked

25   at.  It's too complex a question to give a general answer

84

1    to.

2         Q    Well, if you were investigating an incident where

3    a gun was pulled, and someone lied about the gun actually

4    being pulled, what types of charges -- and you later on

5    determined that that person lied, what types of charges

6    could be levied against that person to the best of your

7    knowledge?

8              MR. DeMERCHANT:  Objection.

9         A    Could you narrow the scope?  Are we talking about

10   this particular incident?

11        Q    Well, I'm talking in general.  In general when a

12   person lies about an event in which the police, any police

13   department anywhere in the United States are investigating,

14   what would be the punishment for that person in that lie?

15             MR. DeMERCHANT:  Objection.

16        A    That would have to vary from department to

17   department.  But certainly there would be some kind of

18   punitive measures taken.

19        Q    And do you feel that the Groton Town police were

20   within their rights in applying for an arrest warrant for

21   Officer Garcia?

22             MR. DeMERCHANT:  Objection.

23        A    I don't believe I know enough about the case.  I

24   haven't read the Groton reports to form an opinion on that.

25        Q    Okay.  Well, I'm going to let you -- and I know

1   this is quite a bit of material.  But I'm going to have

2   this marked as an exhibit.  And I want you to be able to

3   read through that.

4           Is it your testimony the only information that

5   you had on Officer Garcia's International House of Pancakes

6   location incident of January 28th, 1996, was this one sheet

7   of paper here, which is copied back and front?

8       A    No.  He refers to it in his deposition at some

9   length, and I read that.

10      Q    So besides his deposition and this one page,

11  two-sided copy of the supervisor's complaint form, a

12  complaint report, you received no other information with

13  regard to that incident?

14      A    May I look at that document before I answer that?

15      Q    Sure.  Yes.

16      A    Thank you.  That's the only document I recall,

17  other than his statements in his deposition.

18      Q    And why don't you take a moment and look through

19  that information.

20          MS. MOORE:  And that's going to be marked

21          plaintiff's next in line.

22      Q    Are you finished now reading those documents with

23  regard to Officer Garcia pulling a weapon at the IHOP?

24  Does that assist you in understanding what happened on that

25  evening?

1      A     Yes.

2      Q     And does that give you more information than you

3  had prior to initiating your report in this matter?

4      A     It does.

5      Q     Now, after you've reviewed the circumstances, and

6  we were talking about officers lying or being dishonest --

7  and I wanted to ask you -- let me -- I'm not going to talk

8  about necessarily officers.  I'm just going to talk about a

9  citizen.  If a citizen indicates a statement which is not

10  true to an officer that's investigating a man with a gun

11  incident, what types of charges could be levied against

12  that citizen to the best of your knowledge?

13              MR. DeMERCHANT:  Objection.

14      A     I'm only familiar with Massachusetts charges.  We

15  don't have a hindering investigation charge.  It would

16  probably fall under the category of disorderly conduct.

17      Q     And when you say "hindering investigation

18  charge," are you aware that Connecticut has a hindering

19  investigation charge?

20      A     I am not aware of that.

21      Q     And what would be, if you know, what would be the

22  maximum penalty for someone charged with disorderly

23  conduct?

24              MR. DeMERCHANT:  Objection.

25      A   .  It would be a fine.

1      Q     And with regard to Officer Garcia not being

2   honest of being asked the first time "was there a gun,"

3   does that lead you to believe anything with regard to his

4   training and professionalism as a police officer?

5                   MR. DeMERCHANT:   Objection.

6      A     Could you ask that question again?

7      Q     Well, in your report you talk about the

8   background of Officer Garcia, as well as Officer Williams,

9   and their training.   Upon reading the information in this

10  packet, does this change your view of Officer Garcia?

11                  MR. DeMERCHANT:   Objection.

12     A     No, it doesn't.

13     Q     And why not?

14     A     I look at his overall career.   And when I look at

15  the picture in its totality, that was the only issue that

16  comes to light that could be referred to as less than

17  positive.   And also, he felt that he was acting as a police

18  officer by going to the aid of a victim of domestic abuse.

19     Q     Now, when you go to the aid of a victim of

20  domestic abuse -- if you see someone being struck by

21  another person, what is that crime called?

22     A     We call it assault and battery.

23     Q     And can a person be arrested for that, assault

24  and battery?

25     A     Yes.

1    Q    And do you know from reading this document or any

2    other document in that box or on this table if anybody was

3    arrested that night for assault and battery?

4    A    No.  I believe no one was arrested.

5    Q    And can you offer a plausible reason why that

6    wouldn't have occurred, if you know?

7            MR. DeMERCHANT:  Objection.

8    A    I don't know why.

9    Q    And if there were no injuries on the person of

10   the alleged victim of this domestic violence, do you have

11   any plausible reason why that might occur?

12           MR. DeMERCHANT:  Objection.

13   A    No.  None whatsoever.

14   Q    And you looked at this document?  You read

15   through this document?  You painstakingly read through this

16   document within, I would say, ten or fifteen minutes now.

17   And when you read through that document, you concede that

18   Officer Garcia was not honest with the Groton Town police;

19   is that correct?

20           MR. DeMERCHANT:  Objection.

21   A    The possibility that he was confused also

22   occurred to me.

23   Q    So you said the possibility that he was confused

24   occurred to you?

25   A    Yes.

89

1     Q     Confused when he drew the gun or confused after

2     he drew the gun?

3                MR. DeMERCHANT:  Objection.

4     A     In his statement, he states that when the Groton

5     officer asked if there was a gun involved, he felt that he

6     was inquiring about the participants in the domestic and he

7     didn't feel that he was referring to him.

8     Q     So you're saying -- is it a possibility that he

9     was lying as well?

10                MR. DeMERCHANT:  Objection.

11    A     Yes.

12    Q     So your answer to the possibility he was lying

13    was yes?

14    A     Yes, it is.

15    Q     And with regard to Officer Garcia by three

16    witness accounts pointing this weapon at Mr. -- I believe

17    his name is Mr. Kincade.  No.  Ronnie Cade.

18    A     Cade.

19    Q     If that occurred, would that have been excessive

20    force?

21    A     Could you ask the question again?

22    Q     Well, the way the scenario is set up is that

23    Officer Garcia by his own account indicates that he pulled

24    his weapon.  And it also indicates, and I believe all the

25    witnesses indicate, that there were no other weapons in the

1    hands of anyone else at the scene.

2           By Officer Garcia pulling his weapon on unarmed

3    civilians, would that have been excessive force given this

4    same fact pattern?

5           MR. DeMERCHANT:  Objection.

6    A    Yes.

7    Q    Okay.  Can you explain why Officer Garcia pulling

8    his weapon on unarmed civilians was excessive force?

9           MR. DeMERCHANT:  Objection.

10   A    I don't see it as unarmed civilians.  The way I

11   read it there was one individual and he was advancing on

12   Officer Garcia unarmed.  At that point, it's my opinion

13   that a lower level of force would have been appropriate.

14   Q    And what lower level of force can you advance

15   that would have been more appropriate in this situation?

16   A    At first attempt to verbally deescalate him, if

17   possible.

18   Q    And what would have been the next level?

19   A    With this same group of facts and circumstances

20   Officer Garcia was limited.  He didn't have any other lower

21   level of use of force to avoid them.  Or at least none are

22   brought to my attention, other than an empty hands

23   response.

24   Q    And if this gun was pointed at these unarmed

25   civilians, you indicate that he received -- with this fact

1    pattern, you indicate you read somewhere that he received

2    some discipline; is that correct?

3              MR. DeMERCHANT:  Objection.

4       A    I believe, yes.

5       Q    And if in fact Officer Garcia was lying and he

6    actually did pull this gun and he wasn't confused about

7    what the police were asking him, in fact he was lying, what

8    should have been his punishment?

9              MR. DeMERCHANT:  Objection.

10      A    You're asking me hypothetically if he was lying

11   with the identical facts and circumstances?

12      Q    Right.

13      A    He alleges he held his firearm at the low ready

14   and he didn't point it at someone.  Is that the

15   hypothetical you're giving me?

16      Q    Yes.  Well, actually, I'm giving you the whole

17   hypothetical where there are three witnesses saying that he

18   did point, and that he says that he didn't.  And just the

19   whole fact pattern, that's what I want you to take into

20   account.  Not just what Officer Garcia says, but what three

21   unarmed civilians said.

22             MR. DeMERCHANT:  Same objection.

23      A    To answer a hypothetical, I have to say that the

24   female victim of this claims she saw no gun.  And Garcia's

25   companion said she saw no gun.  My big concern at that

1   point would be the fact that there was a possibility of

2   falsehood given.

3       Q    Okay.  But with that possibility of a falsehood

4   given, what should have been the discipline of Officer

5   Garcia?

6                   MR. DeMERCHANT:  Objection.

7       A    I need to get clear parameters on the

8   hypothetical.

9       Q    Okay.  Well, let's make it this incident, exactly

10  what happened with all of the witnesses.  You did read

11  Lieutenant Morton's report?

12      A    I believe I did, yes.

13      Q    And he's a lieutenant like you?

14      A    Yes.

15      Q    And he is the one that sought the application to

16  the state's attorney's office; is that correct?

17      A    I believe so.

18      Q    And in his synopsis he indicated that there was

19  some problems with Officer Garcia's story, is that correct,

20  as you read it?

21      A    I don't recall.

22      Q    Let me give you -- I'm going to refer to page 3

23  of Lieutenant Morton's report.  He's with Groton Town

24  police.

25      A    Thank you.  Any particular portion of the page?

1    Q    If you want, you can start with -- start with --

2  one, two, three -- the fourth paragraph down.

3         And let me ask a question while you're reading

4  that.  Would it have been appropriate for Officer Garcia to

5  identify himself as a police officer?

6    A    Yes.

7    Q    And if he had not identified himself as a police

8  officer, is that cause for discipline?

9    A    In this particular incident, I don't believe so.

10  But I certainly believe it would be very helpful if he had

11  identified himself as a police officer.

12   Q    I just want you to refresh -- if you can refresh

13  your recollection with reading that.

14        Now, is it obvious to you that Lieutenant Morton

15  of the Groton Town police, after hearing all the evidence

16  and facts in this man with the gun scenario, thought that

17  Officer Garcia committed a crime?

18              MR. DeMERCHANT:  Objection.

19   A    From the report, no.  But I'm aware of the fact

20  that Groton police attempted to get a warrant for his

21  arrest.

22   Q    And did you feel that was a reasonable course of

23  action given the facts and circumstances as they existed?

24              MR. DeMERCHANT:  Objection.

25   A    No, I do not.

94

1     Q    So you believe that Lieutenant Morton of the

2  Groton Town police was incorrect in applying for the

3  warrant?

4     A    No.  I thought Lieutenant Morton wrote a very

5  impartial report.  I don't think he drew any specific

6  conclusions.

7     Q   Well, why would anyone apply for a warrant for

8  someone's arrest like in this case?

9     A    That person believed they had probable cause that

10  a crime had been committed.

11     Q    Right.  So if Lieutenant Morton applied for the

12  arrest warrant, would you -- I mean, you don't apply for

13  arrest warrants all the time on every little action, do

14  you?

15     A    No, I don't.

16     Q    So you pick and choose which events that you

17  apply for an arrest warrant with; is that correct?

18     A    Yes.

19     Q    Because you believe as a lieutenant, and here

20  Lieutenant Morton believed, that there was probable cause

21  that a crime was committed by Officer Garcia; is that true?

22            MR. DeMERCHANT:  Objection.

23     A    Can you ask that question again?

24     Q    Sure.  Well, you said you don't necessarily apply

25  for arrest warrants in all incidents.  But the fact that

95

1    Lieutenant Morton in the Groton Town police applied for one

2    in the case, would it be a fair statement that they

3    believed there was probable cause to believe that a crime

4    had been committed by Officer Garcia that night?

5                  MR. DeMERCHANT:  Objection.

6        A    I can't speculate what another person did.  I am

7    aware they did attempt to get a warrant.  But what their

8    thought process was, I'm not prepared to answer that.

9        Q    Well, forget their thought process.  Let's look

10    at the results.  Let's look at the action itself.  Why

11    would the Groton Town police attempt to get an arrest

12    warrant for Officer Garcia --

13                  MR. DeMERCHANT:  Objection.

14        Q    -- having read these documents about him pulling

15    a gun?

16                  MR. DeMERCHANT:  Same objection.

17        A    I don't believe I would have applied for one.  I

18    believe there was enough conflicting information there that

19    I don't feel comfortable that probable cause had arisen.

20        Q    And you indicated earlier that you were aware

21    that Officer Garcia had been at a nightclub drinking right

22    before this incident; is that correct?

23        A    That's my impression, yes.

24        Q    And you don't have any problem with him consuming

25    alcohol and carrying his off-duty weapon?

96

1              MR. DeMERCHANT:  Objection.

2      A     I don't.  I would have to look at the actions

3  that resulted from him consuming alcohol.

4      Q     Now, what in your training -- your training other

5  police officers that are up and coming, do you have any

6  training, or even in the booklet that you had published to

7  help with the training of officers, did you comment on the

8  concerns of alcohol and gunplay?

9              MR. DeMERCHANT:  Objection.

10     A     As it applies to an off-duty armed officer?

11     Q     Well, as it applies to any police officer.

12     A     I don't believe that I've articulated anything in

13  writing on that topic.

14     Q     Now, as you sit there today, I'm sure you have

15  formed opinions with regard to alcohol and the use of

16  off-duty weapons, do you not?

17             MR. DeMERCHANT:  Objection.

18     A     Yes, I have.

19     Q     And, in your opinion, is it prudent for an

20  officer to pull his gun while he had been drinking?

21             MR. DeMERCHANT:  Objection.

22     A     I would say it would not be prudent.

23     Q     And why not?

24     A     Well, obviously, the opinion and the degree of

25  alcohol consumption, it could impair your judgment.

1      Q    And, to the best of your knowledge, was anybody

2  arrested for domestic violence that evening?

3      A    I do not believe there were any arrests.

4      Q    And, to the best of your knowledge, was there any

5  physical injuries on the alleged victim of domestic

6  violence that evening?

7              MR. DeMERCHANT:  Objection.  Asked and

8           answered.

9      A    I don't believe there was any marks on the

10  female.

11      Q    And when you have those considerations and you're

12  investigating this incident, there being no marks on the

13  individual, there not being an arrest of a person that was

14  of alleged to have struck someone else, do you have any

15  conclusions about that?

16              MR. DeMERCHANT:  Objection.

17      A    No, I don't.  I haven't formed any conclusions on

18  that.

19      Q    Well, do you think after you read this scenario,

20  that if Officer Garcia was telling the truth, that Mr. Cade

21  would have been arrested for assaulting another individual?

22              MR. DeMERCHANT:  Objection.

23      A    Are you asking me hypothetically if I were

24  Officer Garcia?

25      Q    No.  No.  I'm asking you, if you had been --

1    well, taking into consideration what you just read and --

2    yeah.  If you had been Officer Garcia and you see

3    someone -- you allegedly see someone strike another

4    individual.  A situation of domestic violence.  And I think

5    in his deposition he says beating up.  So that would

6    basically imply there was more than one hit.  I mean, what

7    would have been -- how would you have proceeded?

8           MR. DeMERCHANT:  Objection.

9    A    Hypothetically, if I was at my jurisdiction, he

10   would have been arrested.

11   Q    And if you weren't in your jurisdiction, would

12   you call for assistance, or would you try to monitor the

13   situation so that this offender would not get away?

14   A    We're asking a hypothetical, the identical facts

15   and circumstances?

16   Q    Right.

17   A    Yes, I would have utilized a phone to obtain his

18   license and direction of travel.

19   Q    And as you sit there today, can you offer any

20   plausible reason why Officer Garcia didn't do that?

21          MR. DeMERCHANT:  Objection.

22   A    No, I cannot.

23   Q    And did he use proper police procedure in not

24   doing that?

25          MR. DeMERCHANT:  Objection.

99

1    A    No.  I believe he did not.

2    Q    And should he have went back for some training

3  after that incident with regard to proper police procedure

4  and how to, I guess, how to surveil and maybe how to take

5  into custody offenders, people who are beating people up?

6            MR. DeMERCHANT:  Objection to form.

7    A    Well, Officer Garcia's position was somewhat

8  awkward.  He had no jurisdiction in that area.  And I'm not

9  sure what the citizen arrest statutes are in Connecticut.

10  But I believe that Ronnie Cade should have been arrested

11  for striking his wife.

12    Q    And my question to you is, because he wasn't --

13  because Officer Garcia didn't follow proper police

14  procedure for an event that he alleged occurred, should he

15  be sent back for any training with regard to apprehending

16  alleged suspects of domestic violence or anything to that

17  nature?

18            MR. DeMERCHANT:  Objection to form.

19    A    I would have to know more about what Officer

20  Garcia was thinking.  Possibly he may not have reacted and

21  arrested because he was out of his jurisdiction.  I do know

22  he notes that someone took down the license plate number,

23  so he was aware that an effort was made to identify the

24  assailant.

25    Q    With regard to the 911 calls that were made from

100

1    IHOP to Groton Town police, did you review those tapes?

2         A    I did.  I believe I did.  I read some -- I

3    thought they were transcripts.

4         Q    Well, did you actually hear the tapes or

5    anything?

6         A    No, I have not.

7         Q    And just so that it's clear, you indicated --

8    because I still haven't found it.  I was looking while you

9    were reading -- the discipline that was taken against

10   Officer Garcia for this incident.

11        A    Are you asking me a question?

12        Q    Yes.

13        A    I believe he was required to review their use of

14   force policies.

15        Q    And where would you have gotten that information?

16        A    I am not sure.  I've read a large volume of

17   documents.

18        Q    But you believe that it's somewhere within this

19   box of materials that you are going to tender to me a copy

20   later on?

21        A    I believe so, yes.

22        Q    And besides this incident where you believed

23   Officer Garcia used excessive force with regard to

24   Mr. Cade, is there any other instances where you reviewed

25   Officer Garcia's background, or any other information that

101

1  you've received in this case where you believe that Officer

2  Garcia may have used excessive force?

3                  MR. DeMERCHANT:  Objection.

4      A    I'm not sure I'd characterize Officer Garcia's

5  display of a firearm as excessive force.  Inappropriate

6  certainly.

7      Q    So are you saying now that Officer Garcia pulling

8  that weapon on unarmed civilians was not excessive force?

9                  MR. DeMERCHANT:  Objection to form.

10     A    I believe you asked me if he pointed the weapon

11  at Ronnie Cade was excessive and I said it was.  Officer

12  Garcia and his companion say he didn't point it at him.

13  And Ronnie Cade's wife said she never saw a gun.  So to

14  categorize that incident as excessive force, I'm not

15  prepared to do that.

16     Q    Okay.  Well, the simple fact that Officer Garcia

17  took the gun out of the holster -- and we just went through

18  a continuum of force and you had indicated that perhaps he

19  could have, you know, did some verbal, you know, types of

20  containment of the situation.  I'm just going to ask you

21  point blank.  By Officer Garcia pulling is weapon during

22  that event, was that excessive force?

23     A    It depends on which version of events you want me

24  to believe, because obviously there's two conflicting ones.

25  But clearly the weapon was pulled out, at least according

102

1    to Officer Garcia and to Ronnie Cade.  And I think that

2    weapon being taken out at that point in the encounter was

3    too soon.  Inappropriate.

4        Q    It was inappropriate?  Inappropriate force?

5        A    Inappropriate force.

6        Q    And you're distinguishing that from excessive

7    force; is that correct?

8        A    Right.  My concern is that if it was pointed at

9    Ronnie Cade, then that would become excessive force.

10       Q    Now, my question is this:  Besides this incident,

11   what other documents did you review with regard to Officer

12   Garcia's background?

13       A    I reviewed his resume, his evaluations, his

14   academy transcripts, his in-service training.  And I

15   believe there were three civilian complaints leveled

16   against Officer Garcia, which I read.

17       Q    Do you know about whether or not Officer Garcia

18   was in fact a named defendant in a lawsuit besides this

19   one?

20       A    I believe I do.

21       Q    And would that be Nolan versus the City of New

22   London and Gaspar Garcia, et al.?

23       A    Yes.  I don't know if that's exactly within the

24   complaint, but I know there was a death.  And I believe the

25   gentleman's name was Nolan.