*Pd $255*

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARION HOLEMAN, ET AL       :     NO.:  3:00 CV 1608 (DJS)

                                :

v.                         :

                                :

CITY OF NEW LONDON, ET AL     :     SEPTEMBER 14, 2004

## NOTICE OF APPEAL

Pursuant to Fed.R.A.P. 4(a)(1), the defendants, CITY OF NEW LONDON, NEW

LONDON POLICE DEPARTMENT, GASPAR VINCENT GARCIA, BRUCE RINEHART,

GREG WILLIAMS AND JOHN DOE, hereby give notice and appeal to the United States

Court of Appeals for the Second Circuit from the following Judgment or Order:

> Ruling and Order dated August 16, 2004 by *Squatrito, J.*,
> granting in part and denying in part the defendant's Motion
> for Summary Judgment dated December 20, 2002

The Judgment or Order in this action was entered on August 17, 2004.  A copy of

the Judgment or Order is attached hereto as Exhibit A.

THE DEFENDANTS,
CITY OF NEW LONDON, NEW
LONDON POLICE DEPARTMENT,
GASPAR VINCENT GARCIA, BRUCE
RINEHART, GREG WILLIAMS AND
JOHN DOE

John J. Radshaw, III
ct19882
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 14th day of September 2004.

Sandy M. Moore, Esquire
Attorney at Law
80 Broad Street
New London, CT  06320

Jeffrey T. Londregan, Esquire
CONWAY & LONDREGAN, P.C.
38 Huntington Street
P.O. Box 1351
New London, CT  06320-1351

Richard Hustad Miller, Esquire
Attorney at Law
POB 365
Uncasville, CT 06382

Lynn D. Wittenbrink, Esquire
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120

John J. Radshaw III

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARION HOLEMAN and WALLACE          :
HOLEMAN, administratrixes of the    :
ESTATE OF DARRELL HOLEMAN,          :
    Plaintiffs,                     :
                                    :    No. 3:00CV1608 (DJS)
v.                                  :
                                    :
CITY OF NEW LONDON, ET. AL,         :
    Defendants.                     :
                                    :

## MEMORANDUM OF DECISION

The administrators of the estate of Darrell Holeman, Marion Holeman and Wallace

Holeman, bring this 42 U.S.C. §1983 action against defendants the City of New London, the

New London Police Department, Gasper Vincent Garcia, Bruce Rinehart, Greg Williams, and

John Doe. Plaintiffs allege that defendants violated Darrell Holeman's constitutional rights

guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Plaintiffs also assert claims under Connecticut law for: wrongful death; false arrest and

imprisonment; assault and battery; abuse of process; conspiracy tort; negligence; and willful,

wanton, and intentional conduct. Pursuant to Fed. R. Civ. P. 41, the court GRANTS plaintiffs'

request to dismiss the City of New London Police Department and John Doe as defendants and to

voluntarily withdraw the claims arising under the First and Eighth Amendments as well as the

pendant state law claims of gross negligence, slander and libel, and prima facie tort. Defendants

move for summary judgment [doc. # 36] pursuant to Fed. R. Civ. P. 56(c). For the following

reasons, defendants' motion is GRANTED in part.

-1-

EXHIBIT A

## FACTS

The decedent, Darrell Holeman ("Holeman"), was a citizen of the United States and a resident of the City of New London, Connecticut. Defendants, Gaspar Vincent Garcia ("Garcia") and Greg Williams ("Williams") were New London Police officers. Both Garcia and Williams graduated from the police academy and received training in criminal investigation, human relations, defensive tactics, and use of force. Garcia and Williams also received supplemental training on topics including: laws of arrest, stopping suspects, use of force, search and seizure, use of firearms, shooting decisions, and tactical weapons. Defendant Bruce Rinehart ("Rinehart") is the Chief of Police for the City of New London, a post he held at the time the events related here transpired.

During the early morning hours of August 22, 1999, Holeman and Kerri Smith ("Smith") were driving along Pequot Avenue in New London. Smith owned the car and was behind the wheel the morning in question. Officer Williams was on patrol in the Pequot Avenue area at the time. He noticed Smith's car traveling on Pequot Avenue sometime after 4:10 a.m. Pequot Avenue is an area with a comparably greater amount of criminal activity than other areas of New London. Williams followed Smith's car and viewed its maneuvers. When the car reached the intersection of Walbach Street and Howard Street, Williams observed the car hesitate and stop at a stop sign although the car did not run any stop signs or traffic lights. Williams watched the car loop around the block and decided to stop the vehicle because he believed that the car may be lost and that criminal activity was afoot.

Williams checked the car's license information and learned that it was registered in

-2-

Groton, Connecticut. He stopped the car at 4:28 a.m. and asked the driver if she was lost. Smith said, "Yes, we're trying to find a pay phone." When Williams asked Smith who she needed to call, Smith answered, "My babysitter, I need to check on my children." Williams again asked Smith what she was doing in New London. Smith replied, "I'm trying to find a store." Williams then requested identification from both Smith and Holeman.

A second police officer, Garcia, arrived on the scene during this exchange. Garcia was accompanied by his fiancé, Consuelo Rodriguez, on an approved ride-along. Officer Garcia parked his police vehicle behind Williams' car and then joined Officer Williams.

Both Smith and Holeman presented identification to the officers. After dispatch informed the officers that Holeman was on probation for drug activity, Williams asked Smith if she had any "weapons, bombs, drugs, or dead bodies" in her car. Williams, who was standing by the driver's door, then asked Smith to step out of the car to allow him to search the car. Smith exited the car and Williams searched her person. Williams' search of Smith did not discover any weapons or contraband. Plaintiffs assert that Smith did not consent to the search and that Williams mistakenly interpreted her physical act of exiting the vehicle as nonverbal consent. Defendants contend that Smith consented to the search. Smith testified that she had "agreed to let him [Williams] search my car."

After Williams searched Smith, Garcia opened the passenger door and told Holeman to exit the vehicle. Holeman stood up and faced the car. Garcia directed Holeman to place his hands on the roof of the car. The parties dispute Holeman's subsequent behavior. Plaintiffs contend Holeman complied with the officers' instructions, while defendants assert that Holeman slightly raised his hands.

-3-

The parties agree that Garcia asked Holeman to place his hands on the roof of the vehicle a second time. The parties also agree that Holeman raised his arms to his shoulder height, placed them over the roof of the car, and said, "I'll show you what I got in my pocket." While both parties admit that Holeman moved his hand toward his front pants pocket, they dispute the timing of this motion.

Plaintiffs argue that Garcia and Williams offer differing accounts of Holeman's movements. Garcia observed that "as soon as he [Holeman] said this ["I'll show you what I got in my pocket"] he made a sudden move with his right hand toward his right front pants pocket." Williams stated that after he heard Holeman say, "'I'll give you what's in my pocket.' I [Williams] looked over and saw this guy's hands on the car but he started getting rigid, as if he were getting ready to push off or away. I saw Vinny grab this guy more firmly by the right arm I think and Vinny then said 'Greg come over here.'"

The parties agree that Garcia grabbed Holeman's right arm and that Garcia called Williams for assistance. Williams joined Garcia and Holeman on the passenger side of the vehicle, where he put his left hand on Holeman's left forearm. Williams also wrapped his right arm around Holeman's head in a headlock. A physical struggle ensued, and Williams, a canine handler certified by the North American Work Dog Association, yelled for Consuelo Rodriguez to open the door to his police vehicle and release his police canine. Rodriguez opened the door and "Nero," the police canine, obeyed Williams' command and engaged Holeman.

Garcia released his hold on Holeman when Nero attacked. It is not clear why Garcia stepped away from Holeman, though he may have tripped over Nero. Plaintiffs allege that Garcia drew his weapon as he stepped back from Holeman. Garcia says that he stepped back,

-4-

observed Holeman pull out a silver pistol, and then drew his weapon. Witness Consuelo

Rodriguez also says that she saw Holeman holding a gun. While the parties agree Garcia yelled,

"[h]e's [Holeman] got a gun," plaintiffs deny that Holeman possessed a gun the night in question.

Plaintiffs argue that, after the shooting, Williams and Garcia initially could not find the gun and

had time to plant a weapon when they were alone with Holeman. The Report of the State's

Attorney found that "[t]he pistol was forensically examined for fingerprints," and "[n]o

identifiable latent impressions were developed or found."

Defendants offer a different version of events as they assert that Holeman possessed a gun

throughout his encounter with the officers. Williams contends that he felt a metal object during

the struggle and heard Garcia say that Holeman had a gun. Furthermore, Williams says that he

pushed away from Holeman after hearing Garcia's shouts. Garcia testifies that he fired his

weapon because he saw Holeman point the gun at Williams' head. Garcia's shot hit Holeman.

At this time, Williams, who also was wounded by Garcia's shot, fell to the ground and took

cover behind the front of Smith's car. Garcia contends that he then fired two more shots because

Holeman pointed the gun at him. One of these shots entered the decedent's left side, near his

back.

After being shot, Holeman lowered his hands near his midsection and fell to the ground

between the open passenger door and the main body of Smith's vehicle. Williams then returned

to the passenger side of the vehicle. Garcia and Williams state that they could not see Holeman's

hands, which were near his midsection. Williams ordered Holeman to show his hands several

times. Defendants claim that Holeman did not move his hands. Williams struck Holeman in the

head two or three times and commanded Nero to engage Holeman again. Garcia then saw

-5-

Holeman's left hand move, so Garcia holstered his weapon and placed Holeman's left hand in handcuffs. Both Garcia and Williams moved Holeman's right arm behind his back and handcuffed the decedent's right hand as well.

Garcia radioed his dispatcher at 4:36.45 a.m. to say that shots were fired. He called for an ambulance at 4:37:19 a.m. The scene was then declared "safe" for an ambulance. The firefighters/emergency medical technicians ("EMTs") who were dispatched to the scene provided emergency medical treatment to Holeman. Holeman arrived at L&M Hospital at 4:49:03 a.m. after being transported there by the EMTs. He died at the hospital.

Officer Williams claims that he had a "memory gap" from the time he struck Holeman to the time another officer drove him to the hospital. Neither Garcia nor Williams found a gun on the scene, however, firefighter and emergency medical technician Richard F. Burgess found a gun while he gave Holeman medical treatment. The gun he found was located next to the right rear tire of Smith's vehicle, between the tire and the curb.

## STANDARDS OF REVIEW

### 1. Summary Judgment

A motion for summary judgment turns on whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment may be granted if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 377, 323 (1986). When deciding a motion

for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Thomas v. Roach, 165 F.3d 137 (2d. Cir. 1999). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). However, the nonmovant must establish genuine issues of material fact by presenting "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d. Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper," as then there is no genuine issue of material fact. Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).

### 2. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity. "Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct." Stephenson v. Doe, 332 F.3d 68, 80 n.15 (2d Cir. 2003). "Qualified immunity is more than a simple defense - it is 'an entitlement not to stand trial or face the other burdens of litigation, . . . an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Loria v. Gorman, 306 F.3d 1271, 1281 (2d. Cir.

2002)(emphasis in original). "The doctrine of qualified immunity shields police officers acting

in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions

violate clearly-established rights of which an objectively reasonable official would have known."

Thomas, 165 F.3d at 142.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court established a three-step

analysis for determining whether an officer is entitled to qualified immunity in excessive force

cases. The first stage of the qualified immunity inquiry asks whether the facts, taken in a light

most favorable to the party asserting an injury, could show a constitutional violation. Saucier,

533 U.S. at 201, Cowan v. Breen, 352 F.3d. 756, 760 (2d Cir. 2003), Loria, 306 F.3d at 1281.

The court proceeds with the second and third parts of the qualified immunity inquiry only if a

constitutional violation could be shown on the facts.

The court next determines "[w]hether the [constitutional] right was clearly established."

Saucier, 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." Anderson v. Creighton, 483

U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified

immunity unless the very action in question has been held unlawful, but it is to say that in the

light of pre-existing law the unlawfulness must be apparent." Id. This second step of the analysis

"[m]ust be undertaken in light of the specific context of the case, not as a broad general

proposition; and it too serves to advance understanding of the law and to allow officers to avoid

the burden of trial if qualified immunity is applicable." Saucier, 533 U.S. at 202.

The court analyzes the reasonableness of the officer's conduct in the third phase of the

Saucier test. "The relevant, dispositive inquiry in determining whether a right is clearly

-8-

established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202, (citations omitted). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Id. at 205. "Defendants will not be immune, if, on an objective basis, it is obvious that no reasonably competent officer would take the actions of the defendant." Malley v. Briggs, 475 U.S. 335, 341 (1986). If "officers of reasonable competence could disagree," however, then "immunity should be recognized." Id.

## DISCUSSION

Plaintiffs bring this action pursuant to Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Connecticut law. "Section 1983 'is not itself a source of substantive rights,' but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (citing Baker v. McCollan, 443 U.S. 137, 144, n. 3.(1989)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." Thomas v . Roach, 165 F.3d 137, 142 (2d Cir. 1999). Defendants move for summary judgment with respect to all counts of the complaint and raise the affirmative defense of qualified immunity.

### 1. Plaintiffs' Fifth and Fourteen Amendment Claims.

Plaintiffs improperly assert claims under the Fifth and Fourteenth Amendments. They argue that defendants violated Holeman's Fifth and Fourteenth Amendment rights to due process of law, including his right to be free from unjustified and excessive force. The Supreme Court held that such excessive force claims cannot be brought on due process grounds. Graham v.

Connor, 490 U.S. at 395.  All claims of unlawful search during the course of an arrest must be brought under the Fourth Amendment.  Id.  Hence, excessive force claims may only be raised under the Fourth Amendment.

The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'. . . . " Wren v. U.S., 516 U.S. 806, 808 (1996).  Furthermore, "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  Tennessee v. Garner, 471 U.S. 1, 7 (1985).  Additionally, a due process claim is not appropriate because this is not a case where "a state actor aided and abetted a private party in subjecting a citizen to unwarranted physical harm."  Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998).  Nor is this case one of "[t]hose relatively unusual excessive force cases falling beyond the ambit of the Fourth and Eighth Amendments [which] are redressable only by recourse to state tort law."  Id. (citing Rodriguez v. Phillips, 66 F.3d 470, 477 (2d Cir. 1995)).  Plaintiffs cannot properly raise excessive force claims predicated on due process grounds under the Fifth and Fourteenth Amendments.  The court grants defendants' motion for summary judgment with respect to plaintiffs' claims under the Fifth and Fourteenth Amendments.

### 2. Plaintiffs' Fourth Amendment Claims

Plaintiffs claim that Williams and Garcia violated Holeman's Fourth Amendment rights when the officers improperly stopped the car and searched Holeman.  They also allege that the officers used excessive force during the course of the incident.

The Supreme Court has "long held that the 'touchstone of the Fourth Amendment is

-10-

reasonableness." <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996) (quoting <u>Florida v. Jimeno</u>, 500 U.S. 248, 250 (1996)).  "A free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." <u>Graham</u>, 490 U.S. at 387.  The test of reasonableness "is not capable of precise definition or mechanical application." <u>Id</u>. at 396.  In determining whether defendants violated the Fourth Amendment's reasonableness standard, the court will apply the reasonableness test separately to the traffic stop, the search of Holeman, and the varying degrees of force the officers used against Holeman.  Should the court find a possible constitutional violation with respect to the stop, search, or use of force, the court will engage in the subsequent components of the qualified immunity analysis for that potential violation.

### A. The Traffic Stop

Plaintiffs claim that the police stop of Smith's car was unconstitutional.  Under the Fourth Amendment, the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons. . . .'" <u>Wren</u>, 516 U.S. at 808; <u>see also</u> <u>United States v. Scopo</u>, 19 F.3d 777, 781 (2d Cir. 1994) (citations omitted).  "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." <u>Wren</u>, 516 U.S. at 808.  Thus, a court conducting this reasonableness inquiry must look to the particular reasons the police officer stopped the vehicle and determine if the officer had reasonable suspicion or probable cause.  <u>See</u> <u>Id</u>. at 809-10; <u>Scopo</u>, 19 F.3d at 781.

-11-

Reasonable suspicion and probable cause are "[f]luid concepts that take their substantive content from the particular contexts in which the standards are being assessed." Ornelas v. United States, 517 U.S. 690, 696 (1996). "The principle components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." Id.

Subjective intentions play no role in this ordinary probable cause analysis. Wren, 516 U.S. at 813; see also Arkansas v. Sullivan, 532 U.S. 769, 771-72. A police officer must "[p]oint to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). "[P]robable cause arises when the police reasonably believe that 'an offense has been or is being committed.'" Scopo, 19 F.3d at 781 (citing U.S. v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987) cert. denied, 484 U.S. 1077 (1988)).

Williams, to justify his stop, must point to specific and articulable facts that demonstrate a reasonable belief that an offense had been or was about to be committed. It is not enough, in the absence of a traffic violation, for Williams to say that he believed the vehicle was lost and that criminal activity might be afoot. Williams argues that the following particular facts provided him with probable cause to stop the vehicle: (1) the car hesitated and stopped at a stop sign; (2) after turning at the stop sign, the car proceeded on a route where it had already traveled when Williams first saw the vehicle; (3) the car, which was driving around New London, was registered in Groton, Connecticut; (4) these events occurred at approximately 4:30 a.m.; and (5) these events occurred in a high crime neighborhood. Plaintiffs do not dispute these facts.

-12-

The court notes that these facts are strikingly similar to the facts of <u>State v. Donahue</u>, 251 Conn. 636 (1999).  The Connecticut Supreme Court in <u>Donahue</u> concluded that an investigatory stop based on police observation of a legally owned vehicle driving in a high-crime neighborhood late at night was improper under <u>Terry</u>. The Court stated in dicta that the "general nonspecific aura of suspicion" created by the presence of a vehicle in a deserted, high-crime neighborhood did not rise to the "standard of reasonable and articulable suspicion" necessary to justify a stop. <u>Donahue</u>, 251 Conn. at 664 n.10.

The court finds the factual analysis in <u>Donahue</u> persuasive. The specific and articulable facts proffered by Williams, even taken together as a whole, do not establish that Williams could have had a particularized and objective basis for suspecting Smith or Holeman of criminal activity. Based on the information Williams had available at the time of the stop, a jury could find that no "objective manifestation" existed to suggest that either Smith or Holeman were engaged in or about to become engaged in criminal activity. Accordingly, there is a genuine issue of material fact as to whether the traffic stop was reasonable under the Fourth Amendment.

Since a constitutional violation could be shown, the court must proceed to the qualified immunity inquiry and ask whether the right violated was clearly established. See <u>Saucier</u>, 533 U.S. at 201. Reasonable minds could not disagree that the contours of the law regarding investigatory traffic stops was well-settled prior to August 22, 1999. "Except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth

-13-

Amendment." Delaware v. Prouse, 440 U.S. 648, 663 (1979). "[Fourth Amendment] policy is not furthered by permitting police officers to stop citizens . . . simply for the well-intentioned purpose of providing directions." United States v. Dunbar, 470 F. Supp. 704, 708 (D. Conn. 1979). The law does not permit a traffic stop without a reasonable and articulable suspicion that some criminal activity is likely to occur.

The court must next decide whether "it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201. The court finds that Williams and Garcia ought to have known that the Fourth Amendment requires more than observing a car driving through a high crime neighborhood at an odd hour to show probable cause for a traffic stop. The police may not decide to stop a vehicle based on a hunch or feeling. Nor may an investigatory stop be justified by a desire to give directions or ask questions. Officers of reasonable competence would not dispute that the facts available to Williams were insufficient to support a reasonable and articulable suspicion that Smith and Holeman were engaged in or about to partake in criminal activity. Accordingly, defendants are not entitled to qualified immunity. Defendants' motion for summary judgment with respect to this claim is denied.

### B. The Search

Plaintiffs argue that Williams and Garcia violated the Fourth Amendment's protection against unreasonable searches and seizures when the officers attempted to search the vehicle and its occupants. Plaintiffs maintain that Smith never consented to the search of the car; rather they allege that Williams mistakenly interpreted Smith's physical act of exiting the vehicle as nonverbal consent. Defendants counter that Williams and Garcia obtained Smith's consent prior to commencing the search and that the search was constitutional.

-14-

Under the Fourth Amendment, warrantless searches are per se unreasonable "subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Consent is one such exception. Schneckloth, 412 U.S. at 218, United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995), United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995).

Consent must be given voluntarily, Schneckloth, 412 U.S. at 222, United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993), by an individual whose property is to be searched or a third party who possess common authority over the premises. Elliott, 50 F.3d at 186. When deciding whether an individual consented, "[c]ourts must examine the totality of the circumstances to determine whether the consent was a product of the individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." Garcia, 56 F.3d at 422 (quoting United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993)). Consent may not be coerced. Garcia, 56 F.3d at 422. Furthermore, "[i]t is well established that knowledge of the right to refuse consent is not a requirement to a finding of voluntariness." Id. (citing Schneckloth, 412 U.S. at 231-33). Consent may be inferred "from an individual's words, acts, or conduct." Id. at 424.

If a court finds that an individual voluntarily consented, the court must next determine the scope of that consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995)(quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Reasonableness is measured in objective terms by examining the totality of the circumstances.

-15-

Robinette, 519 U.S. at 39.

Smith testified that she permitted Williams to search her vehicle. Officer Williams also testified that he acquired Smith's verbal consent to search the vehicle. There is no evidence in the record rebutting or calling into question Williams' and Smith's testimony, nor is there evidence indicating that Williams forced or coerced Smith's consent. Furthermore, Smith's act of exiting her vehicle constitutes conduct from which Williams could reasonably have inferred consent. While this evidence illustrates that Smith consented to the search of her vehicle, it does not address the scope of her consent with respect to the pat-down searches of the vehicle's occupants.

The scope of consent is critical in this case because it is the attempted search of Holeman that raises constitutional questions in this case. Neither party has shown conclusively either that Smith limited her consent to search only the vehicle or that she agreed to a more comprehensive search that might include Holeman. Further, the record is lacking in clear proofs that might show some exigent circumstance, perhaps a threat to officer safety, that would justify the search of Holeman. The court finds that there is a genuine issue of material fact as to whether Smith's consent to search her vehicle extended to the subsequent pat-down searches.

Although defendants raise qualified immunity as to the search of the vehicle but not as to the pat-down search of Holeman, the court will assume that the defendants intended to seek qualified immunity under all circumstances. Since there is a genuine issue of material fact concerning the scope of Smith's consent, the court cannot determine whether the officers' mistake as to what the law requires was reasonable. Thus, defendants' motion for summary judgment with respect to the search of Holeman is denied.

-16-

## C. Excessive Force

Holeman's estate alleges that Williams and Garcia used excessive force against Holeman. Plaintiffs' excessive force claims must be analyzed under the Fourth Amendment's reasonableness standard. "[T]here is no doubt that <u>Graham v. Connor</u> . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." <u>Saucier</u>, 533 U.S. at 201-202. The <u>Graham</u> standard requires that "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Graham</u>, 490 U.S. at 397.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the counterveiling governmental interests at stake." <u>Graham</u>, 490 U.S. at 396. Courts conducting this reasonableness inquiry must evaluate the specific facts of the case, "[i]ncluding the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id</u>. at 396.

The Second Circuit has developed a more focused inquiry for claims of excessive deadly force. <u>See</u> <u>Salim v. Proulx</u>, 93 F.3d 86, 89 (1996). The court will therefore evaluate the specific facts and circumstances around the varying levels of force Williams and Garcia used against Holeman, in three distinct events: the use of a police canine before the shooting, the shooting,

-17-

and the post-shooting use of force.

### i. Pre-Shooting Use of Force

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. However, "not every push or shove . . . violates the Fourth Amendment," and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation. Graham, 490 U.S. at 396-97.

The record shows that Holeman was not involved in a serious crime when Williams and Garcia asked him to exit the car and place his hands on the roof. The record also shows that there is a genuine issue of material fact as to whether Holeman placed his hands on the roof of the vehicle and otherwise complied with the officers' instructions. Reasonable minds could dispute whether Holeman posed a threat to the officers or was likely to fight back or flee. Thus, there is a genuine issue of material fact as to the reasonableness of the pre-shooting use of force and the police canine.

Since a jury could find a constitutional violation, the court must engage in a qualified immunity analysis. Here, "[t]here is no doubt that Graham clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier, 533 U.S. at 202. Thus, Holeman's Fourth Amendment right to be free from excessive force was "clearly established" at the time of the incident.

The third prong of the qualified immunity inquiry turns on whether a reasonable,

-18-

objective officer would have believed that the law allowed him to employ a police canine and physically struggle with Holeman in the circumstances Williams and Garcia encountered. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id., Stephenson, 332 F.3d at 77-78. "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to qualified immunity as a defense." Saucier, 533 U.S. at 205.

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," Graham, 490 U.S. at 396. Here, the evidence taken most favorably to the plaintiff shows that Holeman made vague, potentially threatening statements and that he made sudden movements not authorized by the police. Reasonable officers could have believed that some force, including the use of a police canine, was necessary to subdue Holeman. The court finds that the defendants did not knowingly violate the law and are therefore entitled to qualified immunity regarding the pre-shooting use of force.

### ii. The Shooting

Plaintiffs allege that defendants overstepped their constitutional authority when they utilized deadly force against Holeman. "A claim that a police officer used excessive force, including deadly force, is properly stylized a section 1983 action and analyzed under the Fourth Amendment's reasonableness standard." Salim, 93 F.3d at 89. The Second Circuit has applied an "immediate threat" criterion in cases involving deadly force. "The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment he made the split-second decision to employ deadly force." Salim, 93 F.3d at 92. Thus,

-19-

"an officer's decision to use deadly force is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" Cowan, 352 F.3d at 762 (citing O'Bert ex rel. Estate of O'Bert v. Vargo, 333 F.3d 29, 36 (2d Cir. 2003). "When there are facts in dispute that are material to a determination of reasonableness," summary judgment is inappropriate. Thomas, 165 F.3d at 140, 143; see also Cowan, 352 F.3d at 762-63.

The parties dispute material facts crucial to the reasonableness inquiry in this case. There is a genuine issue of material fact regarding whether Holeman complied with the officers' instructions as well as whether he possessed a gun. A finding of fact as to these key issues is necessary to determine whether Holeman posed an "immediate threat" to the safety of the officers and whether it was reasonable for Garcia to fire his weapon without warning. Therefore, summary judgment is inappropriate and the court must proceed with the qualified immunity analysis.

There can be no dispute that freedom from the use of excessive, deadly force is a clearly established constitutional right. See Garner, 471 U.S. at 9. Thus, the court must ask whether a reasonably competent officer would conclude that Williams' and Garcia's mistaken belief as to what the law requires was reasonable. Saucier, 533 U.S. at 205.

"The objective reasonableness test will not be met 'if on an objective basis, it is obvious that no reasonably competent officer would have concluded' in that moment that his use of deadly force was necessary." O'Bert, 331 F.3d at 37. Furthermore, where "genuine, material, factual disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied." Cowan, 352 F.3d at 764. The law governing deadly force requires an

-20-

officer to have probable cause to believe that the suspect poses a significant threat of physical harm to the officer or others. There is a genuine issue of material fact as to whether Holeman possessed a gun, and unless that question is resolved, the reasonableness of Garcia's actions cannot be determined. It is clear that if Holeman was unarmed, the standard for the use of deadly force is not met, and Holeman's constitutional rights were violated. Therefore, Williams and Garcia are not entitled to qualified immunity and defendants' motion for summary judgment is denied.

### iii. Post-Shooting Force

Plaintiffs allege that the force the officers used against Holeman after he was shot violated Holeman's Fourth Amendment rights. Defendants assert that the officers employed a reasonable amount of force because they maintain that Holeman continued to pose a threat to them.

While the parties agree that Holeman fell to the ground after he was shot, they dispute whether he possessed a weapon. The parties also dispute Holeman's post-shooting medical condition and ability to harm the officers. This evidence shows that there is a genuine issue of material fact as to whether Holeman continued to pose an immediate threat to the safety of Williams and Garcia. Accordingly, reasonable minds could conclude that the post-shooting force was unreasonable under the Fourth Amendment. See Stephenson, 332 F.3d at 77 (quoting Saucier, at 201-02)("It is well established that 'use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness").

If an officer is mistaken as to what the law requires, that officer is entitled to qualified immunity. Saucier, 533 U.S. at 205. Here, the court finds that the legality of the defendants'

decisions to punch Holeman and use a police dog against him after he had been shot turns on whether Holeman possessed a weapon and continued to pose an immediate threat to the safety of the officers. These facts dictate whether officers of reasonable competence could dispute the legality of the defendants' decisions. Accordingly, defendants are not entitled to qualified immunity on summary judgment. Defendants' motion for summary judgment on the post-shooting use of force is denied.

### 3. Plaintiffs' Claims against the City of New London and Chief Rinehart

Plaintiffs allege that the City of New London and Chief Rinehart engaged in a policy, practice or custom of failing to properly train its police officers and that these practices rose to the level of "deliberate indifference." Specifically, plaintiffs assert that: New London failed to detect or ignored whether Garcia or Williams had previous propensities for violence; the city's police training program was insufficient; and the city did not have a proper mechanism to evaluate officer behavior. Plaintiffs also assert that Rinehart improperly supervised Williams and Garcia.

These claims must be evaluated under the test set forth in Monell v. Department of Social Services., 436 U.S. 658 (1978). Under Monell, a municipality may liable under Section 1983 "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694. Plaintiffs must prove "both the existence of a municipal policy or custom and a causal connection between that policy or custom and the deprivation of his constitutional rights" to hold New London liable under Section 1983. A "city may be held liable under Section 1983 when

'official policy [is] the moving force of the constitutional violation." <u>Dodd v. City of Norwich</u>, 827 F. 2d 1, 5 (2d Cir. 1987).

An exception to the general rule exists when excessive force is the claim at issue. "A municipality may be liable under Section 1983 in cases of police brutality where the city's failure to supervise or discipline its officers amounts to a policy of deliberate indifference." <u>Thomas</u>, 165 F.3d at 145. "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." <u>Vann v. City of New York</u>, 72 F.2d 1040, 1049 (2d Cir. 1995); <u>see</u> <u>Canton v. Harris</u>, 489 U.S. 378, 390 (1989). However, "the mere assertion . . . that a municipality has . . . a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." <u>Dwares v. City of New York</u>, 985 F.2d 94, 100 (2d Cir. 1993).

Plaintiffs have not shown that the city failed to supervise or train its officers while defendants were employed by New London or during the events giving rise to this litigation. Plaintiffs admit that as police officers, Garcia and Williams were required to attend approximately forty hours of job-related training and continuing education. Furthermore, plaintiffs did not establish any municipal policy that was the "moving force behind the alleged constitutional deprivation." <u>See</u> <u>Thomas</u>, 165 F.3d at 146. There is no evidence in the record to support the notion that New London had a policy or custom of deliberate indifference with respect to its police officers' use of excessive force, nor is there evidence which could establish a causal link between any such custom and the officers' actions. Accordingly, defendants' motion for summary judgment with respect to the City of New London is granted.

-23-

### 4. Plaintiffs' Claims under Connecticut Law

Plaintiffs also bring several state law claims against defendants. These claims include negligence; willful, wanton, and intentional conduct; wrongful death; false arrest and imprisonment; assault and battery; abuse of process, and conspiracy tort. Defendants raise the affirmative defenses of qualified immunity and governmental immunity and argue that they are entitled to summary judgment.

Under Connecticut law, "[a] municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts." Mulligan v. Rioux, 229 Conn. 716, 727 (1994) (citations omitted; internal quotation marks omitted). Governmental acts "are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature," whereas ministerial acts "refer to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." Id. The defendants' actions qualify as discretionary acts and are thus immune. See, e.g., Castorina v. Stewart, No. CV 950324487, 1998 WL 309393, at *6 (Conn.Super. June 3, 1998) (finding that an officer's actions in arresting an individual were discretionary as a matter of law); Cook v. City of Hartford, No. CV89-0362482, 1992 WL 220102, *2 (Conn.Super. Aug. 31, 1992) ("The act of training and supervising police officers is clearly a discretionary function").

Plaintiffs' argue that the three exceptions to immunity for discretionary acts apply:

[F]irst, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm...; second, where a statute specifically provides for a cause of action against a municipality or municipal officer for failure to enforce certain laws...; and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence.

-24-

Evon v. Andrews, 211 Conn. 501, 505 (1989) (citations omitted).  The second exception is not

applicable to this case. The first exception relates to plaintiffs' negligence claim and the third

exception corresponds to plaintiffs willful, wanton, and intentional conduct claim.

### A. Plaintiffs' Negligence Claim

Plaintiffs' allege that Williams' and Garcia's actions constituted negligent behavior,

which subsequently resulted in bodily injury to Holeman.  Defendants cannot claim

governmental liability with respect to their actions because they are potentially subject to the

identifiable person-imminent harm exception to the general rule of governmental immunity.

The identifiable person-imminent harm exception "[h]as been construed 'to apply not

only to identifiable individuals but also to narrowly defined identifiable classes of foreseeable

victims.'" Elinsky v. Marlene, No. CV960557659, 1997 WL 729102, at *6 (Conn.Super. Nov.

14, 1997)(quoting Burns v. Board of Education, 228 Conn. 640, 646 (1994)).  "In determining

the scope of this exception to governmental immunity, courts have considered numerous criteria,

'including the imminency of any potential harm, the likelihood that harm will result from a

failure to act with reasonable care, and the identifiability of the particular victim.'" Id.

Furthermore, "[t]here is no reason that the person subject to imminent harm cannot be a person

whom the officer is dealing with directly." Castorina, 1998 WL 309393, at *6.

Holeman meets the identifiable person test. There is, however, a question of fact to be

decided by the trier of fact as to whether Holeman was a foreseeable victim in imminent harm.

Castorina, 1998 WL 309393, at *7; see also Galindez v. Miller and City of Hartford, 285

F.Supp.2d 190, 195  (D. Conn. 2003) (denying summary judgment for defendant police officer

when plaintiff qualified as identifiable person and facts consistent with pleadings could

demonstrate that defendant's alleged use of force was negligent and likely to subject plaintiff to imminent harm).

Accordingly, the first exception to governmental immunity could apply to plaintiffs' negligence claim. Defendants' motion for summary judgment on plaintiffs' negligence claim is denied.

### B. Plaintiffs' Willful, Wanton, and Intentional Conduct Claim

Acts involving malice, wantonness or intent to injure are within the scope of the third exception to governmental immunity for the performance of discretionary acts. Evon, 211 Conn. at 505. The Connecticut Supreme Court has held that "in the context of common-law tort actions," the claims for wanton and reckless conduct and willful, intentional, and malicious conduct are indistinguishable. Elliott v. City of Waterbury, 245 Conn. 385, 414 (1998). "In order to establish that the defendants' conduct was wanton, reckless, willful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a 'state of consciousness with reference to the consequences of one's acts...[Such conduct] is more than negligence, more than gross negligence..." Id. Indeed, such conduct "indicates a reckless disregard of the just rights or safety of others or the consequences of this action..." Id. The facts alleged by Holeman show that Williams' punching and use of Nero after the shooting could constitute a conscious use of unlawful force that rises to the level of willful, wanton, and intentional conduct. There are genuine issues of material fact with respect to the reasonableness of the force defendants employed against Holeman and to defendants' state of mind regarding Holeman's safety both before and after the shooting. Governmental immunity does not attach to acts involving malice, wantonness, or intent to injure. Defendants' motion for summary

-26-

judgment on plaintiffs' claim of willful, wanton, and intentional conduct is denied.

### C. Plaintiffs' Wrongful Death Claim

Actions for injuries resulting in death are governed by Connecticut's Wrongful Death Statute. Section 52-555 of the Connecticut General Statutes reads, in relevant part that: "In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor may recover from the party legally at fault for such injuries..." Conn. Gen. Stat. § 52-555. Under this statute, plaintiffs, as the administrators of Darrell Holeman's estate, have the right to bring a wrongful death action. "[A]n action for wrongful death did not exist at common law, and only exists in Connecticut as provided by the legislature." Waller v. State, No. 094816, 1993 WL 129668, *1 (Conn.Super. Apr. 15, 1993) (citing Ecker v. West, 205 Conn. 219, 231 (1987)). Plaintiffs "must prove not only a violation of a standard of care as a wrongful act, but also a causal relation between the injury and the resulting death," in accordance with the statute. Grody v. Tulin, 170 Conn. 443, 448 (1976) (citations omitted).

Here, the "wrongful act" hinges on whether the force defendants used against the decedent was "reasonable" under the Fourth Amendment. Since there are genuine issues of material fact regarding the reasonableness of the force employed against Holeman, defendants' motion for summary judgment on plaintiff's wrongful death claim is denied.

### D. Plaintiffs' Claim of False Arrest and Imprisonment

The intentional tort of "false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." Green v. Donroe, 186 Conn. 265, 267 (1982). "The applicable law for these two causes of action is identical." Outlaw v. City of Meriden, 43

-27-

Conn.App. 387, 392, cert. denied, 239 Conn. 946 (1996). "[I]n the case of false imprisonment the detention must be wholly unlawful…[t]o prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce to it willingly." Lo Sacco v. Young, 20 Conn.App. 6, 19 (1989). Thus, plaintiffs must prove that defendants' seizure of Holeman was "wholly unlawful."

In the case of an individual arrested without a warrant, Section 54-1f of the Connecticut General Statutes "requires that the arresting officer have probable cause to effect a valid arrest… [t]hus, in order to prevail on [his] complaint, the plaintiff [has] the burden of proving that the arresting officer did not have probable cause to arrest [him]." Conn. Gen. Stat. §54-1b. There is, in this action, a genuine issue of material fact as to whether Williams had probable cause to stop Smith and Holeman, whether Holeman cooperated with the police officers' instructions, whether Holeman possessed a gun, and whether the force employed against Holeman was legally appropriate. Thus, reasonable minds could disagree as to whether the officers had probable cause to arrest the decedent, and there is a genuine issue of material fact regarding whether Holeman's arrest was unlawful. Accordingly, defendants' motion for summary judgment on the false imprisonment claim is denied.

### E. Plaintiffs' Assault and Battery Claim

Defendants assert that Section 53a-22 of the Connecticut General Statute provides them with an affirmative defense against plaintiffs' assault and battery claim. The statute allows a peace officer to use physical force to the extent the officer "reasonably believes" such force is necessary to "effect an arrest or prevent the escape from custody of a person whom he reasonably

-28-

believes to have committed an offense" or to "defend himself or a third person from the use of imminent physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent escape." Furthermore, §53a-22 allows an officer to use deadly force when he "reasonably believes" that such force is necessary "to defend himself or a third person. . . ." Since there is a genuine issue of material fact regarding the reasonableness of the varying kinds of force defendants used against Holeman, such as the pre-shooting use of force, the shooting, and the post-shooting punches and use of a police canine, defendants' motion for summary judgment is denied.

### F. Plaintiff's Abuse of Process Claim

A cause of action for abuse of process can be brought "against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." Mozzochi v. Beck, 204 Conn. 490, 494 (1987)(internal quotation marks omitted). Such a claim must show that a legal process was used "primarily to accomplish a purpose for which it is not designed. . . ." Id. Furthermore, "[t]he claim must assert facts indicating that process was misused or abused." New England Mortgage Group, Inc. v. Lebowitz, No. CV970160827, 2001 WL 951330, *2 (Conn.Super. July 20, 2001). In the case at bar, plaintiffs fail to meet their burden of asserting facts which show how the process was misused or abused. The record is devoid of any evidence establishing that defendants used a legal process for a purpose for which it is not designed. Accordingly, defendants' motion for summary judgment on the abuse of process claim is granted.

### G. Plaintiffs' Conspiracy Tort Claim

Plaintiffs raise the claim of conspiracy tort despite the fact that "[u]nder Connecticut law,

-29-

technically speaking, there is no such thing as a civil action for conspiracy." Litchfield Asset

Management Corp. v. Howell, 70 Conn.App. 133, 140

Defendants' motion is denied with respect to plaintiffs' claims brought pursuant to Section 7-465. Defendants have not demonstrated that plaintiffs' notice to the Town of New London, which is required under the statute, was deficient. Further, the court finds that there are genuine issues of material fact relating to defendants' liability with respect to several of the claims brought forth by plaintiffs. Because liability is still in question, defendants are not entitled to summary judgment on plaintiffs' claims brought pursuant to Section 7-465.

## III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment [doc. #36] is **GRANTED in part**. Judgment shall enter for the defendants on the following claims: (1) the due process claims predicated on the Fifth and Fourteenth Amendments to the United States Constitution; (2) the claim that the pre-shooting use of force violated the Fourth Amendment; (3) the Monell claims against the City of New London and Rinehart; (4) the abuse of process claim; and (5) the conspiracy tort claim. The court **DENIES** defendants' motion for summary judgment with respect to all other claims.

The parties shall submit a joint trial memorandum on or before September 30, 2004. This case shall be referred to the Honorable Thomas P. Smith, United States Magistrate Judge, for the purpose of conducting a settlement conference.

**IT IS SO ORDERED** at Hartford, Connecticut, this 16th day of August, 2004.

DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE

-31-